### UNITED STATES of America

v.

### David GOLDBERG, Kenneth Dreifus and Joseph Yorizzo, Defendants.

### No. 83 CR 727 (WK).

United States District Court,
S.D. New York.

May 21, 1984.

**304**

Rudolph W. Giuliani, U.S. Atty., S.D.N.Y. by Stacey J. Moritz, Asst. U.S. Atty., New York City, for plaintiff.

Barry I. Slotnick, P.C. by Barry I. Slotnick, Jill G. Okun, New York City, for defendant Goldberg.

Sudler & Barth by Peter D. Sudler, New York City, for defendant Dreifus.

Polstein, Ferrara & Campriello by Robert Polstein, New York City, for defendant Yorizzo.

## MEMORANDUM AND ORDER

WHITMAN KNAPP, District Judge.

This case involves the activity of three defendants who schemed to aid a third party in opening a foreign bank account without triggering any reporting requirements which would alert the Government to the transaction. The Government's principal contentions are set forth in count one of the indictment. It is there charged that defendants conspired to violate Title 31, United States Code, §§ 5313, 5314, 5315, and 5322(b). Defendants assert that, even if everything the Government says is true, their actions do not constitute the crime charged and move for dismissal of the indictment. Although defendants' actions might indicate a ready willingness to engage in criminal conduct, we find they do not constitute the conspiracy charged.

### BACKGROUND

The Government contends—and for present purposes we assume—that the following occurred between October 19th and 21st, 1983. On October 19th Special Agent Marc Lotz of the Internal Revenue Service, posing as a potential bank customer, met with defendant David Goldberg, an officer of the United Mizrachi Bank ("UMB"), at its New York City office. He told Goldberg that he was a Persian rug dealer and that he wanted to open a personal checking account. Later in the conversation Lotz told Goldberg that he had hundreds of thousands of dollars in cash which he wished to move from safe deposit boxes to accounts in a foreign country, and that he wanted these transactions arranged so that no one would be aware of them. Goldberg assured Lotz that the bank could accommodate his present and future needs. With respect to the personal checking account, Goldberg suggested that the account be opened with only nine thousand dollars in cash, and that the remainder be deposited later. This, he explained, would enable the bank to avoid a regulation requiring it to file a currency transaction report informing the Internal Revenue Service of the deposit. Lotz agreed to follow the advice and

filled out various forms with which to open the account. It is not clear whether the first nine thousand was in fact deposited, but it is clear that the scheme was never completed. When Lotz returned later in the day Goldberg informed him that the bank had decided not to accept the account.

To deal with this refusal, Goldberg offered to take Lotz to another bank which would be able to accommodate his needs. Goldberg walked Lotz over to the North American Bank Ltd. ("NAB"), a representative branch of an Israeli bank, where they met with defendant Kenneth Dreifus, who was introduced as manager of the branch. Dreifus, Goldberg and Lotz discussed means by which Lotz could move cash out of the country without the Government being notified. The parties' main concern was to avoid triggering any banking regulations which would require a financial institution to file a report with the Internal Revenue Service. They settled on the following plan: Lotz would purchase a cashier's check which he would deposit with NAB to open a foreign account. As will be discussed below, such a transaction would not trigger a reporting requirement. He would purchase the cashier's check for a fee of $25,000 from defendant Joseph Yorizzo or Yorizzo's employer, Future Positions, a gasoline wholesaler. The check would be drawn on Future Positions's account with UMB and made payable to NAB, thus eliminating any traceable connection between the check and Lotz.

On October 20th Lotz and Goldberg spoke by telephone several times. In the first of these conversations Goldberg indicated that he believed that Lotz's money had been derived from the sale of narcotics. In a subsequent conversation Goldberg told Lotz that to justify the withdrawal of the $175,000 from Future Positions's account, Future Positions was insisting on receiving from Lotz a document showing the purchase and payment of $175,000 in Persian rugs. Lotz agreed to this condition.

On October 21st defendant Yorizzo, in the regular course of his employment as a messenger for Future Positions, collected $298,000 in cash from various customers and deposited it with Future Positions's account at UMB. UMB filed a currency transaction report accurately reflecting the source of these funds. Yorizzo apparently then withdrew $175,000 in the form of a cashier's check made payable to NAB.

Later in the day, as arranged, Lotz went to NAB with the $200,000 in cash. There he met with Goldberg, Yorizzo and Dreifus and exchanged the cash for the $175,000 cashier's check. While Yorizzo counted the cash, Dreifus prepared documents to enable Lotz to open a foreign account. These papers consisted of two sets of forms, one containing Lotz's supposed [undercover] identity and one containing a different fictitious name. Dreifus assured Lotz that the form containing the supposedly real identity would be locked away. At this point Lotz's back-up team entered and arrested the three defendants. It is not suggested that any defendant had formed any plan to deposit any portion of this $200,000 in any bank account.

## DISCUSSION

■ Count one of the indictment charges the defendants with conspiring to violate Title 31, United States Code, §§ 5313, 5314, 5315, and 5322(b). As § 5322(b) is merely an enhancement provision,[1] we will address alleged violations of only the preceeding sections.

Section 5313 provides, in relevant part:
(a) When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coin or currency (or other mone-

---

1. 31 U.S.C. § 5322(b) provides:
(b) A person willfully violating this subchapter or a regulation prescribed under this subchapter (except section 5315 of this title or a regulation prescribed under section 5315), while violating another law of the United States or as part of a pattern of illegal activity involving transactions of more than $100,000 in a 12-month period, shall be fined not more than $500,000, imprisoned for not more than 5 years, or both.

tary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes. A participant acting for another person shall make the report as the agent or bailee of the person and identify the person for whom the transaction is being made.

The implementing regulation requires that each financial institution file a report with the Commissioner of Internal Revenue of every transaction involving currency of more than $10,000. 31 C.F.R. § 103.22. The report must be made on Treasury form 4789 commonly called a "currency transaction report." The completed form indicates who conducted the transaction with the financial institution as well as for whom the transaction was completed. Thus, to violate § 5313 or the regulations promulgated thereunder, one must either be a financial institution or must cause a financial institution to fail to file a required report and the transaction in question must involve more than $10,000 in currency.[2]

▮▮▮ The Government's main contention is that each defendant himself is a "financial institution" and as such was required to file a currency transaction report on receipt of the $200,000 cash. We find absolutely no support for such a contention. The term "financial institution" is defined in 31 U.S.C. § 5312 and in 31

C.F.R. § 103.11. The statute simply lists twenty-one different types of individuals or organizations, none of which could by any stretch of the imagination be said to apply to any of the instant defendants. The Government in its brief tangentially refers to the term "private banker," the third of the listed classifications. It needs no argument to demonstrate that that term neither applies to an employee of a commercial bank (defendants Goldberg and Dreifus) or of a gasoline wholesaler (defendant Yorizzo). The regulation defines the term as follows:

Each agency, branch, or office within the United States of any person doing business in one or more of the capacities listed below:

(1) A bank (except bank credit card systems);

(2) A broker or dealer in securities;

(3) A person who engages as a business in dealing in or exchanging currency as, for example, a dealer in foreign exchange or a person engaged primarily in the cashing of checks;

(4) A person who engages as a business in the issuing, selling or redeeming of travelers' checks, money orders, or similar instruments, except one who does so as a selling agent exclusively or as an incidental part of another business;

(5) A licensed transmitter of funds, or other person engaged in the business of transmitting funds abroad for others.

2. This framework for violation of the statute comports with the Congressional purpose, articulated by the Supreme Court in *California Bankers Ass'n. v. Schultz* (1974) 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812, behind passage of the subchapter. As the Court observed, one concern Congress had was

to insure that domestic banks and financial institutions continue to maintain adequate records of their financial transactions with their customers. Congress found that the recent growth of financial institutions in the United States had been paralleled by an increase in criminal activity which made use of these institutions. While many of the records which the Secretary by regulations ultimately

required to be kept had been traditionally maintained by the voluntary action of many domestic financial institutions, Congress noted that in recent years some larger banks had abolished or limited the practice of photocopying checks, drafts, and similar instruments drawn on them and presented for payment. The absence of such records, whether through failure to make them in the first instance or through failure to retain them, was thought to seriously impair the ability of the Federal Government to enforce the myriad criminal, tax, and regulatory provisions of laws which Congress enacted.

*Id.* at 26–27, 94 S.Ct. at 1500–1501.

The Government argues that since defendants accepted $200,000 in currency in exchange for a bank check and since they agreed to conduct similar transactions in the future, the defendants may be considered financial institutions within the meaning of the regulation. Such a contention flies in the face of its plain meaning and finds no support in case law. To be considered a financial institution the regulation requires that an agency, branch, or office of a person do business in one of several capacities. One such capacity—and the only one which the Government claims to be relevant—is "engag[ing] *as a business* in dealing in or exchanging currency as, for example, ... a person engaged *primarily* in the cashing of checks." (Emphasis added.) 31 C.F.R. § 103.11(3). A single transaction between individuals involving the exchange of a check for currency—even if some future transactions are contemplated—cannot bring one within the definition of "engaging as a business" in exchanging currency. The example given by the regulation, "a person engaged primarily in the cashing of checks," makes it clear that it does not apply to an individual whose primary occupation is something else but who embarks upon an isolated—or even a series of isolated—transactions involving the exchanging of a check for currency.

The weakness of the Government's claim that each defendant was a financial institution was most cogently illustrated during oral argument when the only support offered was *United States v. Eduardo Orozco-Prada, et al.* (2d Cir.1984), 732 F.2d 1076 [3], a case that lends no support whatsoever. In *Orozco* the named defendant conceded at trial that he was acting as a financial institution, and it was obvious that what he did was within the regulatory definition. Orozco's organization—Cirex International—had as its principal, if not only activity, a "foreign exchange business." That is, Orozco moved cash through eighteen different bank accounts, mostly in the names of other people or various Panamanian corporations. In addition, he and his partner had made efforts to obtain a license to act as a foreign exchange house—apparently to "legitimize" what they were already doing.

In no other case cited by the Government was a person or organization not primarily engaged in some form of banking found to be a financial institution. *United States v. Konefal* (N.D.N.Y.1983) 566 F.Supp. 698 (bank), *United States v. Tobon-Builes* (11th Cir.1983) 706 F.2d 1092 (bank), *United States v. Thompson* (5th Cir.1979) 603 F.2d 1200 (bank).

In brief, the Government has been able to cite to no authority to suggest that any of these defendants—none of whom is either a "private banker" 'or an individual engaged "primarily" in the cashing of checks—was obliged to file any of the reports required by the regulations.

■ Having rejected the Government's main contention, we turn to the question of whether the defendants caused, or conspired to cause, a financial institution to fail to file a required report. To answer this question we must determine whether any of the defendants' acts—or contemplated acts—did, or could have, triggered a reporting requirement. Defendant Yorizzo deposited $298,000 with Future Positions's account at UMB. This transaction required the bank to file a currency transaction report, which report, accurately reflecting the fact that Yorizzo had collected the deposited money from his employer's customers, was duly filed. Lotz then delivered $200,000 in cash to the defendants. Since the defendants themselves were not financial institutions, this transaction triggered no reporting requirement. Moreover, there is no allegation that any defendant ever intended to deposit any portion of the $200,000 in any bank account.[4] Finally,

---

3. The Court of Appeals later affirmed the district court without reference to any definition of "financial institution." *United States v. Eduardo Orozco-Prada, et al.*, 732 F.2d 1076 (2d Cir.1984).

4. In a letter to the Court dated April 20, 1984 Assistant United States Attorney Stacy Moritz specifically stated that "[t]he Government will not be proving that the conspirators planned to

the defendants planned ' to deposit the $175,000 bank check with NAB. Since a bank check is not "currency" within the meaning of the statute, this transaction also required no report.[5] The defendants therefore did not cause, nor did they contemplate any act which could have caused, a financial institution to fail to file a report in violation of § 5313.

■ The Government contends that a violation can nonetheless be found if defendants structured a transaction in such a way as to avoid a reporting requirement. To support this contention the Government relies on *United States v. Thompson* (5th Cir.1979) 603 F.2d 1200, *United States v. Tobon-Builes* (11th Cir.1983) 706 F.2d 1092, and *United States v. Konefal* (N.D.N.Y. 1983) 566 F.Supp. 698. In each of these cases, however,· a defendant artificially broke up a currency transaction to conceal from a bank its obligation to file the report that would be required by the transaction as a whole.

In *United States v. Thompson, supra,* the defendant, Chairman of the Board of the ·Ridglea Bank, arranged for one Michael Welch to receive a series of loans. The defendant had five separate notes prepared, each in the amount of $9,000. He personally processed the notes and, upon presentation to a commercial teller, received $45,000 in cash in five separate $9,000 bundles which he immediately transferred to Welch. Form 4789 (the currency transaction report) contains an instruction specifying that "[m]ultiple transactions by or for any person which in one day total more than $10,000 should be treated as a single transaction, if the financial institution is aware of them." Thus, the defendant structured his transaction to conceal from the bank its obligation to file the currency transaction report specifically called for by the quoted instruction.

In *Tobon-Builes, supra,* the defendant and a companion acting on his behalf, went to ten banks in a six-hour period and at each made pairs of cash purchases of cashiers checks, each pair totaling approximately $18,000. The Court considered the reporting requirements of Title 31 and the regulations promulgated thereunder, and concluded that the defendant was involved in "at least 10 'transactions in currency of more than $10,000' which [in toto] were clearly within the ambit of the financial institution reporting requirements." 706 F.2d at 1098. As in *Thompson,* the Court concluded that the defendant could not circumvent a reporting obligation by breaking up a single transaction into deceptively small components. *Id.*

In *Konefal, supra,* the indictment charged that defendant purchased cashier's checks at various banks in amounts less than the $10,000 threshold to prevent the banks from filing currency transaction reports. On the basis of *United States v. Thompson, supra,* the Court found the activities to amount to a series of single transactions constituting a violation of 31 U.S.C. § 5313.

In the case at bar, unlike those cited by the Government, every transaction was what it purported to be. The defendants purchased a cashier's check from an individual and deposited that check with a branch of a foreign bank. No obligation to file a report was triggered; no obligation to file a report was concealed. The Government's position seems to boil down to the contention that in enacting Title 31, §§ 5313, 5314 and 5315, Congress was not providing a carefully structured set of requirements which must be strictly obeyed, but was laying down a broad horatory exhortation that anyone contemplating the transfer of funds to a foreign country

deposit the $200,000 in cash at the United Mizrachi Bank or any other bank."

**5.** 31 C.F.R. § 103.11 defines currency as "The coin and currency of the United States or of any other country, which circulate in and are customarily used and accepted as money in the country in which issued. It includes U.S. silver certificates, U.S. notes and Federal Reserve notes, *but does not include bank checks* or other negotiable instruments not customarily accepted as money." (Emphasis added.)

should find some way of notifying the Government.[6]

■ Turning to § 5314, it provides, in pertinent part:

... The Secretary of the Treasury shall require a resident or citizen of the United States or a person in, and doing business in the United States to keep records, file reports, or keep records and file reports, when the resident, citizen or person makes a transaction or maintains a relation for any person with a foreign financial agency.

The regulations promulgated under this section require that each person subject to the jurisdiction of the United States having a financial interest in, or signature or other authority over, a bank, securities or other financial account in a foreign country shall report the relationship to the Secretary for each year in which such relationship exists. 31 C.F.R. § 103.24. Pursuant to this regulation, persons with foreign accounts must report such accounts on yearly tax returns. *California Bankers Ass'n. v. Shultz* (1974) 416 U.S. 21, 37, 94 S.Ct. 1494, 1505, 39 L.Ed.2d 812.

The Government offers no explanation of how defendants may have violated this section which appears to be directed at individuals with interests in foreign accounts. It is not even suggested that any of the defendants had any such interest. We fail to see a violation of § 5314.

■ The remaining section, § 5315, neither requires nor prohibits any activity. Regulations promulgated pursuant to it, however, require that each person who physically transports, mails, or ships currency in an amount in excess of $5,000 from the United States to any place outside the country, or the reverse, make a report

of such act. 31 C.F.R. § 103.23. The Government is silent as to its theory of how defendants conspired to violate this requirement. The indictment does not allege that any defendant did or intended to physically transport currency from the United States to another country. Count one cannot be sustained on an alleged violation of this section.

After careful examination of the indictment and all the evidence before us, we fail to see a conspiracy to violate Title 31, §§ 5313, 5314, 5315 or 5322(b). Count 1 of the indictment is accordingly dismissed.

## REMAINING COUNTS AND MOTIONS

With the dismissal of count one, most of defendants' pending motions have become moot. These include:

1. Defendants' request that the Court inspect the minutes of the grand jury;

2. Defendants' motions for further discovery;

3. Dreifus' suppression motions;

4. Dreifus' motion for severance of his trial; and

5. Yorizzo's motion to sever count one or, in the alternative, to sever his trial from that of the other defendants. Each of these motions assumes the validity of count one and is therefore dismissed as moot.

Count three of the indictment charges Goldberg with carrying a firearm during the commission of a felony, "specifically the conspiracy set forth in Count One of the Indictment." Although no motion to dismiss has been addressed to the Court, it is apparent that this count must also fail.

■ Goldberg has moved for dismissal of count four on the ground that it is

6. Illustrative of the fallacy of the Government's free-wheeling theory that the regulations should be interpreted to prohibit any perceived evil is the circumstance that gambling casinos, which deal extensively in cash, and exchange checks for cash on a regular basis are not considered to fall within the regulatory definition of "financial institution," and are not required to file currency transaction reports with the Internal Revenue Service. To remedy this situation, an amendment to the regulations has been suggested which would declare casinos to be financial institutions for the purpose of the Act. *See* Statement of the Honorable Robet E. Powis, Deputy Assistant Secretary (Enforcement), United States Treasury Department, before the Subcommittee on Crime, Committee on the Judiciary, House of Representatives, February 10, 1984.

insufficiently pleaded. The sufficiency of an indictment turns on whether or not it conforms to minimal constitutional standards. U.S. Const. amend. VI. ("In all criminal prosecutions, the accused shall enjoy the right ... to be informed of the nature and cause of the accusation..."). These standards require that the defendant be called to answer charges actually brought by the Grand Jury and be informed of the time, place and essential elements of the crime to permit preparation of a defense and protection against double jeopardy. *United States v. Russel* (1962) 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240; *Bartell v. United States* (1913) 227 U.S. 427, 33 S.Ct. 383, 57 L.Ed. 583; *United States v. Haas* (5th Cir.1978) 583 F.2d 216.

 Count four charges, in its entirety:

> On or about October 24, 1983, in the Southern District of New York, DAVID GOLDBERG, the defendant, unlawfully, knowingly, and wilfully [sic] did corrupt, obstruct, impede and attempt to obstruct and impede the due administration of justice. (Title 18, United States Code, § 1503.)

Although at oral argument we indicated the view that the count was sustainable, we have since come to a contrary conclusion. No facts—except a general time and place—are provided which would apprise the defendant of the charge or protect against double jeopardy. In every case cited to us in which an obstruction of jus-

tice charge was found sufficient, the indictment alleged some facts to alert the accused to the conduct specifically in issue.[7] *See, e.g., United States v. Weiss* (2d Cir. 1974) 491 F.2d 460, 466, *cert. denied* 419 U.S. 833, 95 S.Ct. 58, 42 L.Ed.2d 59 (defendant charged with corruptly endeavoring to obstruct justice by failing to produce documents which defendant was commanded to produce by subpoena); *United States v. Nicosia* (7th Cir.1980) 638 F.2d 970, 975 (obstruction charge alleged that defendant endeavored to influence a witness to testify falsely; charge listed specific lies the defendant instructed the witness to tell); *United States v. Haas* (5th Cir.1978) 583 F.2d 216, 221 (charge of endeavoring to influence and impede a grand juror included the name of the grand juror and the grand jury, the matter before the grand jury, the information communicated on that subject matter, and the means of communication). No such facts are alleged in the instant indictment. Absent some notice to the defendant of the conduct in issue, the charge is constitutionally infirm and must be dismissed.[8]

In summary, counts one, three and four of the indictment are dismissed. Count two, heretofore not discussed, which names only defendant Goldberg and alleges that he "unlawfully, knowingly, and wilfully did receive and possess a firearm which was not registered to him" remains.

SO ORDERED.

---

7. The Government has cited several cases—none dealing with alleged obstruction of justice—which illustrate a general inhospitality to this type of motion. All these cases use the expression that "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Mayo* (2d Cir.1983) 705 F.2d 62, 78; *United States v. Tramunti* (2d Cir.1975) 513 F.2d 1087, 1113, *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50; *United States v. Sperling* (2d Cir. 1974) 506 F.2d 1323, 1344, *cert. denied* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439; *United States v. Salazar* (2d Cir.1973) 485 F.2d 1272, 1277, *cert. denied* 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882. Here, however, the Government has done *absolutely* no more than track the

language. The indictment would have been just as informative if it had alleged that "on October 24, in the Southern District of New York, defendant David Goldberg violated Title 18, United States Code, section 1503."

8. The Government did tell the defendant, both at oral argument and by letter, that the specific conduct at issue in count four was the destruction and removal of certain documents from the premises of UMB. The Government's belated notice, however, cannot cure the indictment. The defendant may be called to answer only charges actually brought by the grand jury, and not a prosecutor's amplification of those charges. *See United States v. Haas* (5th Cir. 1978) 583 F.2d 216, 219.