UNITED STATES of America,
Appellant,

v.

David GOLDBERG, Kenneth S. Dreifus,
Joseph Yorizzo, Defendants-Appellees.

No. 261, Docket 84–1226.

United States Court of Appeals,
Second Circuit.

Argued Nov. 15, 1984.

Decided March 6, 1985.

Stacey J. Moritz, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Marc J. Gottridge, Asst. U.S. Atty., New York City, on brief), for appellant.

Barry Ivan Slotnick, New York City (Jill G. Okun, Slotnick & Cutler, P.C., New York City, on brief), for defendant-appellee David Goldberg.

Patrick H. Barth, New York City (Peter D. Sudler, Alan Winkler, Sudler & Barth, New York City, on brief), for defendant-appellee Kenneth S. Dreifus.

Robert Polstein, New York City (Austin V. Campriello, Polstein, Ferrara & Campriello, New York City, on the brief), for defendant-appellee Joseph Yorizzo.

Before OAKES and KEARSE, Circuit Judges, and POLLACK, District Judge.*

KEARSE, Circuit Judge:

The United States of America appeals, pursuant to 18 U.S.C. § 3731 (1982), from an order of the United States District Court for the Southern District of New York, Whitman Knapp, *Judge*, dismissing several counts of an indictment charging defendants David Goldberg, Kenneth S. Dreifus, and Joseph Yorizzo with, *inter alia*, conspiring to violate certain reporting requirements of the Bank Secrecy Act, 31 U.S.C. § 5311 *et seq.* (1982) (the "Act"), in violation of 18 U.S.C. § 371 (1982). In an opinion reported at 587 F.Supp. 302 (1984), the court concluded that, as a matter of law, the defendants' acts as set forth in count 1 of the indictment and elaborated on in the government's response to defend-

ants' challenges to the indictment could not reflect the conspiracy charges because none of the defendants was required to file any of the reports required by the Act or the regulations promulgated thereunder. On appeal, the government contends that the district court both misinterpreted the indictment and construed unduly narrowly the Act and the regulations implementing it. For the reasons below, we agree and conclude that the indictment adequately alleged that defendants conspired to violate the Act. We vacate the dismissal of counts 1 and 3 and remand the case for further proceedings.

## I. BACKGROUND

■ In response to the defense motions attacking the indictment, the government submitted to the district court the affidavit of Assistant United States Attorney Stacey J. Moritz ("Moritz Affidavit"), which was based principally on an examination of tapes of conversations between and among the defendants and others in the presence of an undercover Special Agent of the Internal Revenue Service ("IRS") wearing a recording device. In reviewing the district court's dismissal of the indictment, we accept as true all of the allegations of the indictment, as amplified by the Moritz Affidavit. *See, e.g., United States v. Von Barta*, 635 F.2d 999, 1002 (2d Cir.1980), *cert. denied*, 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981). Contrary assertions of fact by the defendants will not be considered. *Id.*

### A. *The Government's Allegations*

The indictment set forth a scheme in which the defendants conspired to aid an undercover agent in transferring out of the United States large amounts of United States currency and in opening a foreign interest-bearing bank account, all without disclosures to the United States Government, in violation of 31 U.S.C. §§ 5313, 5314, 5315, and 5322(b). It charged, *inter*

* Honorable Milton Pollack, Senior Judge of the United States District Court for the Southern District of New York, sitting by designation.

*alia,* that defendants (1) "were engaged as a business in dealing in currency"; (2) agreed to provide a money laundering service for cash transfers in the United States that would conceal the true source and holder of the funds, and agreed, as part of that scheme, "to accept in excess of $3 million in cash transfers in the United States in the period October to December 1983"; (3) agreed to open and assist in the opening of foreign bank accounts on the behalf of United States residents and to transfer currency to those accounts, using false documentation to conceal the true identities of the account holders; and (4) agreed they would not file currency transaction reports with respect to any of the transfers.

The government described the defendants' overt acts as follows. On October 19, 1983, IRS Special Agent Marc Lotz, acting undercover, met with Goldberg at United Mizrahi Bank and Trust Co. ("UMB"), where Goldberg was a bank officer. Lotz stated that he had hundreds of thousands of dollars in cash that he wished to move from safe deposit boxes to interest-bearing accounts outside the United States without disclosing those transactions. Later that day, Goldberg informed him that UMB could not accommodate him, and took Lotz to the North American Bank, Ltd. ("NAB") to meet Dreifus, whom Goldberg introduced as manager and United States representative of NAB. Goldberg and Dreifus suggested ways in which Lotz could move his money out of the United States without notifying the United States Government.

On October 20, Lotz and Goldberg spoke by telephone several times. Lotz told Goldberg that he wanted to move two or three million dollars out of the United States. Goldberg informed Lotz of the plan Goldberg and his colleagues had devised for the laundering and transfer of those funds. Lotz would give the defendants currency; he would receive in exchange a UMB bank check drawn on a UMB customer's account made payable to NAB; the NAB check would then be used to open Lotz's foreign bank account and would not be traceable to Lotz.

Goldberg at first demanded thirty percent of any money thus laundered as the defendants' fees for the laundering. Subsequently, however, he agreed, subject to checking with his partners, to accept $25,000 to launder the first $200,000, on the understanding that this would be a test run for the eventual laundering of a total of $3,000,000. Goldberg stressed that the federal government would never learn of the transactions nor learn that Lotz was earning interest abroad.

On October 21, Lotz arrived at NAB with $200,000 in currency. He met with Goldberg and Dreifus and was introduced to Yorizzo, a retired policeman. In exchange for his $200,000, Lotz was given a UMB bank check for $175,000, drawn on Yorizzo's account. Upon Lotz's arrival at the meeting, Goldberg displayed a handgun and he and Yorizzo demanded to frisk Lotz for a body wire. Goldberg overrode Lotz's protests against the search, stating that precautions were necessary because they were engaged in an illegal transaction.

During this meeting, Goldberg and Yorizzo began counting Lotz's cash on a machine brought to the bank by Yorizzo, and Dreifus prepared documents to open an Israeli bank account for Lotz. Two sets of papers were prepared: one under the "real" name Lotz was using in his undercover capacity and one under a new fictitious name. Dreifus repeatedly assured Lotz that the papers bearing his "real" name would be locked away. After Dreifus had prepared the two documents, and just before Goldberg and Yorizzo had finished counting the $200,000, a team of IRS agents entered the room and arrested the three defendants. The present indictment followed.

### B. *The Proceedings Below*

Count 1 of the indictment charged the defendants with conspiracy, in violation of 18 U.S.C. § 371; to violate 31 U.S.C. § 5313 and the regulations thereunder (which require the reporting of transactions involving more than $10,000 in currency) by caus-

ing "various financial institutions" to fail to file the mandated currency transaction reports, "as part of a pattern of illegal activity involving transactions exceeding $100,000 in a twelve month period." Count 1 also alleged that defendants had conspired, in violation of 18 U.S.C. § 371, to violate 31 U.S.C. § 5314, which requires the reporting of transactions with foreign financial agencies. In pretrial motions the defendants challenged the sufficiency of count 1 on the ground that the conduct alleged did not constitute a federal offense because none of the transactions engaged in by the defendants triggered a requirement under the Act for the filing of reports. The district court agreed, stating that "[a]lthough defendants' actions might indicate a ready willingness to engage in criminal conduct," 587 F.Supp. at 304, the allegations of the indictment failed to describe a conspiracy to violate 31 U.S.C. §§ 5313 or 5314.

The court held that § 5313 was not implicated because the defendants were not financial institutions nor had they caused a financial institution to fail to file a required report. It rejected what it characterized as the government's "main contention," i.e., that "each defendant himself [was] a 'financial institution'," finding that such a contention was inconsistent with the plain meaning of the Act. 587 F.Supp. at 306–07. Finding misplaced the government's reliance on the definition of "financial institution" in 31 C.F.R. § 103.11 (1984) as "[a] person who engages as a business in dealing in or exchanging currency as, for example, a dealer in foreign exchange or a person engaged primarily in the cashing of checks," the court concluded that

> [a] single transaction between individuals involving the exchange of a check for currency—even if some future transactions are contemplated—cannot bring one within the definition of "engaging as a business" in exchanging currency. The example given by the regulation, "a person engaged primarily in the cashing of checks," makes it clear that it does not apply to an individual whose primary occupation is something else but who em-

barks upon an isolated—or even a series of isolated—transactions involving the exchanging of a check for currency.

587 F.Supp. at 307.

The court also concluded that the indictment did not show a conspiracy to violate § 5314 because there was no suggestion that any of the defendants had an interest in a foreign interest-bearing account:

> The Government offers no explanation of how defendants may have violated this section which appears to be directed at individuals with interests in foreign accounts. It is not even suggested that any of the defendants had any such interest. We fail to see a violation of § 5314.

*Id.* at 309.

Accordingly, the district court dismissed count 1 of the indictment. In addition, the court dismissed count 3, which alleged that Goldberg unlawfully possessed a firearm during the commission of the felonies charged in count 1, in violation of 18 U.S.C. § 924(c)(2) (1982), on the ground that count 3 was dependent on count 1; and it dismissed count 4 which charged Goldberg with obstruction of justice, in violation of 18 U.S.C. § 1503 (1982), on the ground that that offense was insufficiently pleaded. The court did not dismiss Count 2, which charged Goldberg with possession of an unregistered firearm, in violation of 26 U.S.C. §§ 5861, 5871 (1982); it stayed trial on count 2 pending disposition of the present appeal.

## C. The Issues on Appeal

On appeal, the government does not challenge the court's dismissal of count 4, but it argues that the court erred in dismissing count 1 (and perforce count 3) because (1) the defendants could be viewed, jointly, as a financial institution within the meaning of the Act, and (2) the fact that no defendant actually possessed an interest in a foreign bank account as contemplated by § 5314 was irrelevant to the charge that they conspired to violate that section.

Finding merit in both of the government's arguments, we vacate the dismissal of counts 1 and 3 and remand for further proceedings.

## II. DISCUSSION

The Bank Secrecy Act was enacted in 1970 "to require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." 31 U.S.C. § 5311. To accomplish that end, the Act established reporting requirements for domestic transactions in United States currency and for transactions involving foreign financial agencies, and pursuant to the Act the Secretary of the Treasury ("Secretary") has promulgated various regulations.

### A. *The Alleged Conspiracy To Violate the Domestic Reporting Requirements of § 5313*

■ The domestic reporting requirements are governed by § 5313, which provides, in pertinent part, as follows:

(a) When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes.

31 U.S.C. § 5313(a). Section 5322(b) of the Act provides that

[a] person willfully violating this subchapter or a regulation prescribed under this subchapter (except section 5315 of this title or a regulation prescribed under section 5315), while violating another law of the United States or as part of a pattern of illegal activity involving transactions of more than $100,000 in a 12-month period, shall be fined not more

than $500,000, imprisoned for not more than 5 years, or both.

The regulation setting forth the reporting requirements envisioned by the Act states, in pertinent part, as follows:

Each financial institution shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution, which involves a transaction in currency of more than $10,000.

31 C.F.R. § 103.22(a) (1984). Since § 5313, as implemented by the regulation, requires reports only by "financial institution[s]," the principal question on this appeal with respect to the alleged conspiracy to violate § 5313 is whether defendants' activities involved such an institution.

The term "financial institution" is defined in both the statute and the regulations. Section 5312(a)(2) of 31 U.S.C. provides twenty-one definitions of "financial institution," including "an insured bank," § 5312(a)(2)(A); "a commercial bank or trust company," § 5312(a)(2)(B); "a private banker," § 5312(a)(2)(C); "a currency exchange," § 5312(a)(2)(J); "an issuer, redeemer, or cashier of travelers' checks, checks, money orders, or similar instruments," § 5312(a)(2)(K); and "another business or agency carrying out a similar, related, or substitute duty or power the Secretary of the Treasury prescribes," § 5312(a)(2)(U). The Secretary's regulations define "financial institution" as follows:

*Financial institution.* Each agency, branch, or office within the United States of any person doing business in one or more of the capacities listed below:

(1) A bank (except bank credit card systems);

(2) A broker or dealer in securities;

(3) A person who engages as a business in dealing in or exchanging currency as, for example, a dealer in foreign exchange or a person engaged primarily in the cashing of checks;

(4) A person who engages as a business in the issuing, selling, or redeeming of travelers' checks, money orders,

or similar instruments, except one who does so as a selling agent exclusively or as an incidental part of another business;

(5) A licensed transmitter of funds, or other person engaged in the business of transmitting funds abroad for others.

31 C.F.R. § 103.11. We conclude that the part of definition (3) that defines a financial institution as "[a] person who engages as a business in dealing in ... currency" is sufficiently broad to encompass the activity alleged in count 1 of the indictment and that its breadth reflects Congress's intent.

The legislative history of the Act indicates that the Act's reporting requirements were designed to provide a sweeping law enforcement tool for locating, *inter alia,* large transfers, in currency, of the proceeds of unlawful transactions. The report by the House of Representatives Committee on Banking and Currency on H.R. 15073, which eventually became the Act, noted as follows:

Criminals deal in money—cash or its equivalent. The deposit and withdrawal of large amounts of currency or its equivalent (monetary instruments) under unusual circumstances may betray a criminal activity. The money in many of these transactions may represent anything from the proceeds of a lottery racket to money for the bribery of public officials.

... [The Act] requires reports of cash transactions involving such amounts, or taking place under such circumstances, as the Secretary of the Treasury shall be regulation prescribe.... These reports may be of considerable value to law enforcement agencies in criminal investigations and prosecutions.

H.R.Rep. No. 975, 91st Cong., 2d Sess. 11–12, *reprinted in* 1970 U.S.Code Cong. & Ad.News 4394, 4396–97 [hereinafter cited as House Report]. *See also California Bankers Assn. v. Shultz,* 416 U.S. 21, 38, 94 S.Ct. 1494, 1506, 39 L.Ed.2d 812 (1974) ("Congress recognized the importance of reports of large and unusual currency transactions in ferreting out criminal activity and desired to strengthen the statutory basis for requiring such reports."); 116 Cong.Rec. 16954 (1970) (statement of Rep. Patman) ("If certain cash transactions are required to be reported to the Treasury Department, law enforcement agencies, particularly in the income tax field, will have a useful tool in their investigations and proceedings.")

In seeking to ferret out those engaged in criminal activity, Congress focused on criminals' increasing use of financial institutions to preserve or conceal the proceeds of their crimes:

During the last decade, law enforcement agencies have found that the increasing growth of our financial institutions has been paralleled by an increase in criminal activity utilizing these institutions. Petty criminals, members of the underworld, those engaging in "white collar" crime and income tax evaders use, in one way or another, financial institutions in carrying on their affairs.

House Report at 10, *reprinted in* 1970 U.S.Code Cong. & Ad.News 4394, 4395. Congress also recognized that a wide range of entities could be used to effect the transfers of large amounts of cash:

The subject matter with which we deal is indeed complicated. It involves the operation not only of our domestic and foreign banking *but also other financial institutions* involved in the exchange of currency or its equivalent, the equivalent being in the form of securities, money orders and a host of other financial instruments.

116 Cong.Rec. 16956–57 (1970) (statement of Rep. Widnall) (emphasis added). It thus sought to reach the maximum amount of criminal conduct possible, and to grant broad authority to the Secretary to impose reporting requirements.

Under the terms of [the Act], the Secretary of the Treasury is granted broad authority to impose reporting requirements on persons and *all other entities cognizable as legal personalties [sic ]*

transferring money or monetary instruments to foreign countries.

*Id.* at 16957 (statement of Rep. Burton) (emphasis added). Congress's assumption was that the reporting requirements would be far-reaching, with the Secretary empowered to exempt normal business transactions from the reporting requirements. *See id.* at 16964–65 (statement of Rep. Hanley).

The Secretary's definition of a financial institution, from which a report is required, as "[a] person who engages as a business in dealing in ... currency," 31 C.F.R. § 103.11, is plainly consistent with Congress's goal of requiring reports from "all ... entities cognizable as legal personal[i]ties" that could be used as instrumentalities for transferring or exchanging currency. Since count 1 of the indictment, as amplified by the Moritz Affidavit, adequately charges that the defendants were engaged as a business in dealing in currency and that the defendants themselves constituted a financial institution that intended not to file reports we conclude that the indictment alleged activities that fit within this definition.

The district court concluded that there were two flaws in count 1's allegation of a conspiracy to violate § 5313. First, it thought the indictment charged that each individual defendant was himself a financial institution, and saw such a characterization as contrary to the plain meaning of the Act. Second, the court read the indictment as charging but a single instance of currency dealing, and apparently concluded that the defendants, individually or jointly, could not be said to be in the "business" of dealing in currency. We disagree with both views.

As to the first, even assuming that the indictment charged that each defendant individually was a financial institution, we would not view such a characterization as outside the intended scope of the Act or the regulations. The regulations define a financial institution in part as "a person." There is no indication in the statute or the regulations that a natural person cannot be

considered a financial institution, and it seems strained to assume that the term "person" was intended to exclude natural persons. Nor is the term "person" limited to natural, discrete individuals. Section 5312(a)(4) of the Act defines "person," in part, by incorporating the definition of that term found in 1 U.S.C. § 1 (1982), which encompasses corporations and partnerships. We need not determine here, however, whether the indictment properly alleged that each individual defendant constituted a financial institution, for the indictment asserted that the defendants "agreed together" to violate the Act's reporting requirements and that they "were engaged as a business in dealing in currency." The most natural reading of these allegations is that defendants were jointly so engaged. This view is supported by the Moritz Affidavit, which recounted, on the basis of taped conversations, that Goldberg and Dreifus suggested to Lotz various methods for transferring currency without reporting; that Goldberg's agreement on a reduced initial laundering fee was made expressly subject to his partners' approval; that Goldberg and Yorizzo insisted on searching Lotz for a wire; that Yorizzo (the only nonbanker among the defendants) brought to the bank a money-counting machine with which he and Goldberg proceeded to count Lotz's cash. Plainly it would be within the terms of the indictment for a jury to find that the defendants had acted as a partnership or joint venture to assist Lotz in laundering currency. We think it clear beyond peradventure that partnerships and joint ventures are among the entities from which Congress sought to require reports.

Further, we disagree with the district judge's view that the indictment failed to substantiate that the defendants engaged in the "business" of dealing in currency because it charged that but a single transaction was involved. Rather, the government charged that the interrupted $200,000 transaction was anticipated by the defendants to be but the first of a series of laundering transactions to take place over

the course of several months; that that first $200,000 was less than 10% of the total amount defendants agreed to launder; and that defendants agreed to reduce their 30% laundering fee by more than half for the first $200,000 in anticipation of the fees they would receive for the remainder of the planned $3 million. Thus, while we agree with the district court that the terms "engage[ ] as a business" or "deal[ ] in" imply that ordinarily proof of more than one transaction would be required, *cf. United States v. Tarr,* 589 F.2d 55, 59 (1st Cir. 1978) ("deal[ing] in" or "engag[ing] in the business of" firearms, within the meaning of 18 U.S.C. § 922(a)(1) (1982), normally implies more than one isolated transaction, although court could "conceive of a single transaction sufficiently large" to be within statute), we conclude that the indictment alleged that a series of transactions had been agreed on and that it is a permissible inference that persons who agree to launder a total of $3 million over a three-month period for fees totaling some $900,000 are doing business. In sum, we conclude that the indictment sufficiently alleged that defendants, as a partnership or joint venture, had engaged as a business in dealing in currency.

Defendants urge us to reach the contrary conclusion by (1) interpreting the terms "financial institution" and "business" as referring only to legitimate enterprises, (2) adopting the view of the district court that the third definition of § 103.11 reaches only persons whose "primary" occupation is exchanging or dealing in currency, or (3) employing the "rule of lenity." We find no merit in any of these contentions.

First, the notion that the Act was meant to require reports only from legitimate entities is contrary to the entire thrust of the Act. Its very purpose was "to give the Secretary authority which will facilitate investigation and prosecution of criminal activities." 116 Cong.Rec. 16957 (1970) (statement of Rep. Widnall). Thus, as to actors transferring money to a foreign country, the Act was intended to impose reporting requirements on "all ... entities

cognizable" as personalities in the eyes of the law. *Id.* (statement of Rep. Burton). We find no support for defendants' argument in the Act, in its history, or in logic.

Nor is there any sound basis for imputing to Congress the intent to reach only persons whose "primary" occupation was dealing in currency. Defendants point only to the second example set out in the third definition of § 103.11, which, after defining "financial institution" as "[a] person who engages as a business in dealing in or exchanging in currency," illustrates by adding "as, for example, a dealer in foreign exchange or a person engaged primarily in the cashing of checks." There is no indication that the word "primarily" should be read as applying to the regulation's basic definition. If the Secretary had intended such a limitation, it would have been a simple matter to insert the word "primary" before "business," thereby defining a financial institution as a person "who engages as a *primary* business" in dealing in currency. The plain fact is that the regulation was not so written, and we see no support for the proposition that defendants are outside the reach of the Act because they may have engaged in the business of money laundering only as a sideline.

Finally, we reject defendants' contention that the rule of lenity sometimes employed in the construction of criminal statutes, *see, e.g., Ladner v. United States,* 358 U.S. 169, 177–78, 79 S.Ct. 209, 213–14, 3 L.Ed.2d 199 (1958), requires the conclusion that defendants' conduct was outside the Act's scope. The rule of lenity is used only to resolve an ambiguity, "not to ... beget one." *Callanan v. United States,* 364 U.S. 587, 464 U.S. 16, 596, 81 S.Ct. 321, 326, 5 L.Ed.2d 312 (1961) (footnote omitted); *Russello v. United States,* 104 S.Ct. 296, 303–04, 78 L.Ed.2d 17 (1983). Nor is it used to narrow a statute that has an unambiguously broad thrust. *See United States v. Moore,* 423 U.S. 122, 145, 96 S.Ct. 335, 346, 46 L.Ed.2d 333 (1975). Since the statutory and regulatory provisions unambiguously cover the defendants' alleged conduct here, the rule of lenity does not come into play.

We conclude that the indictment adequately alleged activities of the defendants that, if proven, would permit the jury to find that they jointly engaged as a business in dealing in currency and thus were a financial institution within the meaning of the Act and the regulations. The district court erred, therefore, in concluding that the indictment failed to charge defendants with conspiring to commit acts that could be found to trigger the Act's reporting requirements.

B. *The Alleged Conspiracy To Violate the Foreign Transaction Reporting Requirements of § 5314*

The Act's reporting requirements with respect to transactions with foreign financial agencies are set forth in 31 U.S.C. § 5314, which, unlike § 5313, imposes those requirements on "resident[s] or citizen[s] of the United States" rather than on financial institutions as such. Section 5314 provides in pertinent part as follows:

(a) Considering the need to avoid impeding or controlling the export or import of monetary instruments and the need to avoid burdening unreasonably a person making a transaction with a foreign financial agency, the Secretary of the Treasury shall require a resident or citizen of the United States or a person in, and doing business in, the United States, to keep records, file reports, or keep records and file reports, when the resident, citizen, or person makes a transaction or maintains a relation for any person with a foreign financial agency. The records and reports shall contain the following information in the way and to the extent the Secretary prescribes:

(1) the identity and address of participants in a transaction or relationship.

(2) the legal capacity in which a participant is acting.

(3) the identity of real parties in interest.

(4) a description of the transaction.

31 U.S.C. § 5314(a). The pertinent regulation provides in part as follows:

Each person subject to the jurisdiction of the United States (except a foreign subsidiary of a U.S. person) having a financial interest in, or signature or other authority over, a bank, securities or other financial account in a foreign country shall report such relationship to the Secretary for each year in which such relationship exists, and shall provide such information as shall be specified in a reporting form prescribed by the Secretary to be filed by such persons.

31 C.F.R. § 103.24 (1984).

In the present case, the district court ruled that the indictment did not sufficiently allege an offense under § 5314 because that section requires reports from an individual having an interest in foreign accounts and it was not alleged that any of the defendants had such an interest. 587 F.Supp. at 309. The court's conclusion does not follow from its premises.

The indictment charged defendants with conspiracy to violate § 5314, in violation of the conspiracy statute, 18 U.S.C. 371, not with a substantive violation of § 5314. Though there was no indication in the indictment that any of the defendants themselves had or were to acquire an interest in a foreign bank account as to which they would be required to report, count 1 fairly alleged that defendants conspired to violate § 5314 by helping Lotz to place large amounts of cash in a foreign account without reporting the fact of such transfers and by providing a service that would conceal the true source and true holder of the funds in such an account. Thus, the indictment, although it did not mention 18 U.S.C. § 2 (1982), the aiding and abetting section, adequately set forth factual allegations which, if proven, would allow the jury to find that defendants had conspired to aid and abet Lotz in failing to report an interest in a foreign bank account. *See United States v. Perry*, 643 F.2d 38, 45–46 (2d Cir.) (defendants may be convicted of conspiring to aid and abet another to commit a substantive offense), *cert. denied*, 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981); *United States v. Taylor*, 464 F.2d 240, 242

n. 1 (2d Cir.1972) (aiding and abetting theory may be submitted to jury though indictment did not charge a violation of 18 U.S.C. § 2).

■ Nor is the fact that there was no actual violation of § 5314 because Lotz never acquired an interest in such an account any impediment to the imposition on defendants of liability for conspiracy. A substantive offense and a conspiracy to commit that offense are separate and distinct crimes. *Callanan v. United States*, 364 U.S. 587, 593, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 (1961); *Pinkerton v. United States*, 328 U.S. 640, 643, 66 S.Ct. 1180, 1182, 90 L.Ed. 1489 (1946); *United States v. Tombrello*, 666 F.2d 485, 489 (11th Cir.), *cert. denied*, 456 U.S. 994, 102 S.Ct. 2279, 73 L.Ed.2d 1291 (1982). A defendant thus may be convicted of the crime of conspiracy even if the substantive offense was not actually committed. *See United States v. Rose*, 590 F.2d 232, 235 (7th Cir.1978), *cert. denied*, 442 U.S. 929, 99 S.Ct. 2859, 61 L.Ed.2d 297 (1979).

■ Finally, while a person acting as an agent of the government cannot be a coconspirator, *see United States v. Tombrello*, 666 F.2d at 490 n. 3; *United States v. Chase*, 372 F.2d 453, 459 (4th Cir.), *cert. denied*, 387 U.S. 907, 87 S.Ct. 1688, 18 L.Ed.2d 626 (1967), the presence of such an agent does not destroy a conspiracy in which at least two other private individuals have agreed to engage in an unlawful venture, *see, e.g., United States v. Elledge*, 723 F.2d 864, 866 (11th Cir.1984), and defendants may be convicted of conspiracy even if, unbeknownst to them, the substantive crime would never have been committed because the person the coconspirators thought would commit it was actually an agent of the government, *see United States v. Rose*, 590 F.2d at 235 (fact that defendants' "plan was doomed because they unwittingly chose as their instrumentalities agents of the government is irrelevant to the existence of the conspiracy"); *United States v. Seelig*, 498 F.2d 109, 113 (5th Cir.1974) ("fact that a government informant was to effect the actual distribution of the drug does not extirpate [the defendants'] liability for conspiring to violate the law").

We find no merit in defendants' contentions that the indictment does not sufficiently plead conspiracy and that they did not have the requisite intent to violate § 5314. Count 1, which expressly invoked § 5314, contained sufficient factual allegations to apprise the defendants of the government's contentions as to the time, place, and nature of, and participants in, the alleged conspiracy to violate that section, as well as many overt acts allegedly done in furtherance thereof. A conspiracy to violate § 5314 was therefore adequately pleaded. *See Wong Tai v. United States*, 273 U.S. 77, 80–81, 47 S.Ct. 300, 301–302, 71 L.Ed. 545 (1927) (indictment for conspiracy need not be pleaded with the same particularity as would be required of an indictment for substantive offense so long as defendant is adequately advised of what charges he must meet). To the extent that defendants argue that they lacked the requisite intent to violate § 5314, they raise factual questions to be determined at trial, not on this appeal.

We have examined all of defendants' other contentions and find them to be without merit.

CONCLUSION

The dismissal of Counts 1 and 3 of the indictment is vacated and the case is remanded for further proceedings not inconsistent with this opinion.