UNITED STATES of America, Appellee,

v.

**Robert A. HAWLEY, Appellant.**

UNITED STATES of America, Appellee,

v.

**Audrey J. HAWLEY, Appellant.**

**Nos. 87–5343, 88–5344.**

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 26, 1988.

Decided Aug. 31, 1988.

William A. Cohan, Denver, Colo., for appellant.

John J. Ulrich, Sioux Falls, S.D., for appellee.

Before BOWMAN, WOLLMAN, and MAGILL, Circuit Judges.

BOWMAN, Circuit Judge.

Robert and Audrey Hawley, husband and wife, appeal their convictions on four counts of violating the currency transaction report (CTR) requirements of the Bank Secrecy Act of 1970 (Act), codified at 31 U.S.C. §§ 5313 and 5322(a). We affirm.

The Hawleys are members of the National Commodity and Barter Association (NCBA), "an unincorporated, voluntary political/educational association of individuals, some of whom are opposed to the current tax, fiscal and monetary laws and policies of the United States, and some of whom believe that the IRS has exceeded its constitutional mandate and should have its powers diminished or abolished." Opening Brief of Defendants/Appellants (Appellants' Brief) at 9. From their office in Alexandria, South Dakota, the Hawleys operated a business called the Mid–States Exchange (Exchange), a "service wing" of the NCBA. The Exchange offered NCBA members opportunities to "return to ... honest warehouse banking principles," according to a brochure distributed by the Hawleys. Exhibit (Ex.) 33. The brochure advertised that clients would be given a secret account number, "[a]s with Swiss banking." Id. The Hawleys described these "warehouse banking" services as follows: the Exchange "takes checks and property conveyed to it by its customers, converts those items to cash or ownership of precious metals, reconverts precious metals to cash when requested to do so by the customer, and pays bills from its customers' accounts at their direction...."

Appellants' Brief at 14 (quoting *Voss v. Bergsgaard*, 774 F.2d 402, 408 n. 2 (10th Cir.1985) (Logan, J., concurring).

The Hawleys began the Exchange in 1981 or 1982. They signed signature cards to set up checking accounts, in the name of the NCBA and/or the Exchange, at several commercial banks in South Dakota, Nebraska, and Iowa. Within these master accounts, individual accounts of NCBA members were designated by number only, to insure that "all accounts are absolutely private." Ex. 33. Thus, the Hawleys advertised, the "MSE can pay your bills for you from your account with NO record traceable to you." *Id.* The evidence at trial focused on the Hawleys' check-cashing service. Customers wishing to obtain cash secretly would write checks to the Exchange or endorse third-party checks for deposit to the master accounts. The Hawleys then would deposit these checks, and a short time later withdraw cash from the master accounts to return to the customers, retaining a service fee for themselves of one-and-one-quarter percent for amounts less than $15,000, and one percent for single transactions of more than $15,000. This circuitous check-cashing system allowed NCBA members to convert checks into cash without leaving any record at a commercial bank of a cash withdrawal attributable to them.

The Exchange employed couriers to carry out the transactions at the various banks, and a bookkeeper in an office at the Hawleys' home. The customers received their cash either through personal delivery or via registered mail. Packets, presumably carrying cash, were insured and sent by registered mail to customers in South Dakota, North Dakota, Nebraska, Iowa, Minnesota, Oklahoma, Wyoming, Montana, Colorado, Nevada, and California.

In 1984, the IRS began to investigate the above-described activities of the Hawleys. After meeting with Robert Hawley on several occasions and joining the NCBA, an IRS undercover agent arranged a meeting with the Hawleys in October 1984. The undercover agent posed as president of a fictitious oil equipment supply company.

At the evening meeting, which took place in the undercover agent's condominium and was secretly videotaped, the "president" discussed his desire to open an account with the Hawleys in order to keep his financial activities private. The Hawleys said they could accommodate his future plans for secretly cashing $150,000 in checks. Robert Hawley suggested that the undercover agent make his checks out to the Exchange and tell his business associates that the Exchange was an "accounting agency" employed by the company. The Hawleys also said that they were "driving the IRS wild" because the government could not figure out how to prosecute them for their warehouse banking activities. Robert Hawley expressed concern that the number of banks which would "wash" their customers' checks was dwindling, and said he was always looking to find or buy a bank that would be "friendly" to the Exchange.

That evening, the undercover agent gave the Hawleys a check for $13,200, which he said was drawn on his corporate account to pay for a bogus "bonus on the Wind River Project." The Hawleys agreed to deliver $12,000 in cash to him as soon as possible. They stated that they could not withdraw the money all at once from one commercial bank, because the bank would be required to notify the IRS of each transaction involving more than $10,000 in currency. Instead, the Hawleys said, their courier could make separate withdrawals of less than $10,000. Then the entire $12,000 could be sent to the undercover agent by registered mail. Pursuant to this agreement, the Hawleys caused the necessary withdrawals to be made and mailed the cash to the undercover agent. The Hawleys did not file a CTR with the IRS reporting the exchange of currency in excess of $10,000 as required by the Act.

The Hawleys performed two other similar transactions involving the delivery of cash in excess of $10,000 to the same undercover agent in December 1984 and January 1985. These three transactions, in addition to a fourth transaction involving a registered mail packet that the Hawleys had insured for more than $10,000, com-

prise the four counts of the indictment charging the Hawleys with intentionally failing to file CTRs for currency transactions exceeding $10,000 by a "financial institution."

The Hawleys had a three-day trial by jury in the District Court. The critical questions for the jury were first, whether the Hawleys' activities made them a "financial institution" within the meaning of the Act, and second, if they were a "financial institution," was their failure to file the required CTRs intentional? The jury found the Hawleys guilty on all four counts.

For reversal, the Hawleys argue that the trial court erred by (1) incorrectly defining "financial institution" in Instruction 11, and (2) denying defendants' motion to suppress evidence seized from the Hawleys' home.

### I.

We turn first to the issues concerning Instruction 11. The Hawleys assert that this instruction incorporated too much of one subsection of the reporting regulations and not enough of another subsection, and should not have included language permitting the jury to find that they were a "private bank" (and therefore a "financial institution" within the meaning of the Act). We disagree.

█ The Hawleys were charged with intentionally violating 31 U.S.C. §§ 5313 and 5322(a), which require any person acting as a "financial institution" to file a CTR with the IRS for every transaction involving more than $10,000 in currency. Congress's intent in passing this reporting requirement was primarily to crack down on money-laundering by drug dealers and white collar criminals, *see, e.g., United States v. Goldberg*, 756 F.2d 949, 954 (2d Cir.), *cert. denied*, 472 U.S. 1009, 105 S.Ct. 2706, 86 L.Ed.2d 721 (1985), but the requirement applies to all transactions by "financial institutions" involving more than $10,000 in cash, even those related to perfectly legal activities. The provisions of the Act requiring CTRs are implemented through Title 31 of the Code of Federal Regulations. "Each financial institution ... shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution which involves a transaction in currency of more than $10,000." 31 C.F.R. § 103.22(a)(1). At the time pertinent to this case, 31 C.F.R. § 103.11, entitled "Meaning of terms," included the following definition: [1]

(e) *Financial institution.* Each agency, branch, or office within the United States of any person doing business in one or more of the capacities listed below:

(1) A bank (except bank credit card systems);

(2) A broker or dealer in securities;

(3) A person who engages as a business in dealing in or exchanging currency as, for example, a dealer in foreign exchange or a person engaged primarily in the cashing of checks;

(4) A person who engages as a business in the issuing, selling, or redeeming of travelers' checks, money orders, or similar instruments, except one who does so as a selling agent exclusively or as an incidental part of another business;

(5) A licensed transmitter of funds ...;

(6) [ ] A casino....

A "bank", which is a "financial institution" under section 103.11(e)(1) above, is also defined in Section 103.11:

(a) *Bank.* Each agent, agency, branch or office within the United States of any person doing business in one or more of the capacities listed below:

(1) A commercial bank or trust company organized under the laws of any State or of the United States;

(2) A private bank; ....

The indictment alleged that the Hawleys had "acted in the capacity of a 'financial institution' (persons engaging as a business in dealing in currency and transmitting funds for others), as defined in Title 31,

---

1. An amended version of this section of the regulations became effective in 1987.

United States Code, Section 5312 and 5313 and Title 31, Code of Federal Regulations, Section 103.11." As the indictment did not specify a particular subsection of section 103.11(e) defining "financial institution," and its parenthetical description of "financial institution"—"persons engaging as a business in dealing in currency and transmitting funds for others"—is not an exact quotation from any of the subsections, the Hawleys' counsel argued at trial that the government had failed to identify any criminal activity. During cross-examination, defense counsel elicited opinions from three government witnesses that the Hawleys' operations may have fit within the definitions provided in subsections (3), (4), or (5) of section 103.11(e).

Relying on the definitions set forth in section 103.11, the trial court fashioned an instruction tailored to the evidence. Instruction 11 incorporates what the court considered to be the pertinent parts of section 103.11, such as the definitions of the terms "currency," "domestic," and "transaction in currency." The instruction also incorporates the following definitions of the terms "bank" and "financial institution" from section 103.11.

> *Bank.* (a) Each agency, branch or office within the United States of any person doing business in one or more of the capacities listed below.
> ... (2) A private bank; ...
> *Financial institution.* [(e)] Each agency, branch, or office within the United States of any person doing business in one or more of the capacities listed below:
> (1) A bank ...; ...
> (3) A person who engages as a business in dealing in or exchanging currency as, for example, a dealer in foreign exchange or a person engaged primarily in the cashing of checks; ...

At trial, counsel for the Hawleys objected to the inclusion of any references to the word "bank" and to the exclusion of the language of section 103.11(e)(4). We consider first the exclusion from the instruction of the language of section 103.11(e)(4).

Specifically, counsel argued that if the Hawleys' activities fit under subsection (3), they also came within subsection (4), which contained an exception for "one who [issues, sells, or redeems travelers' checks, money orders or similar instruments] as a selling agent exclusively or as an incidental part of another business." One theory of the defense was that the Hawleys acted as "selling agents" for the NCBA, or that their services comprised an "incidental part" of the business of the national organization. The Hawleys assert that since at least one of the government's witnesses testified that in his opinion the Exchange may have fit within section 103.11(e)(4), they were entitled to have that subsection read to the jury in Instruction 11.

This argument is without merit. Whether the evidence warrants a particular instruction requires a legal conclusion that the trial court must make based upon its knowledge of both the evidence and the law. This is a question of law and the trial court is in no way bound by an opinion such as the one expressed by the government witness. We agree with the District Court that inclusion of the language of subsection (4) was not appropriate. The language of subsection (3) ("A person who engages as a business in dealing in or exchanging currency") follows more closely than any other subsection the language of the indictment ("persons engaging as a business in dealing in currency and transmitting funds for others"). In addition, the evidence in the case clearly warrants an instruction based on subsection (3), but does not warrant an instruction based on subsection (4) ("a person who engages as a business in the issuing, selling, or redeeming of travelers' checks, money orders, or similar instruments"). Thus, the "selling agents" exception in the second clause of subsection (4) is irrelevant because it modifies only the first clause of subsection (4), which does not fit either the conduct charged in the indictment or the evidence presented to the jury.

The Hawleys' challenge to Instruction 11 based on the trial court's inclusion of subsection (1) from section 103.11(e),

which allowed the jury to find that the Exchange was a "financial institution" because it was a "private bank," is also without merit. First, they assert that the instruction should not have included any reference to "bank" because the indictment did not. But the Hawleys miss the point that "bank" is included among the six definitions of "financial institution" in section 103.11(e). Thus, an indictment describing the Hawleys generally as a "financial institution" could also mean that they were a "bank."

■ Second, the Hawleys assert that they were not a "bank" because the Exchange did not make loans. However, the requirement that an institution must make loans to be defined as a "bank" is found only in the amendments to the Bank Holding Company Act of 1956 (12 U.S.C. § 1841(c)), not among the provisions of the Bank Secrecy Act of 1970. The two statutes deal with different subjects, were enacted at different times, and are codified at different Titles of the United States Code. The term "private bank" is not specifically defined in the Bank Secrecy Act, but we cannot find, nor do appellants point to, any rule of law requiring the trial court to pluck a definition from Title 12 of the United States Code and plug it into the self-contained provisions of Title 31. We believe that the trial court was correct in not doing so. The record is clear that the Hawleys offered their customers the services of a "warehouse bank." *See* Ex. 33 (Exchange brochure promoting "a return to the honest warehouse banking principles"); Tr. at 319 (testimony of bookkeeper for the Exchange that the Hawleys had represented themselves to be a "warehouse bank"). In these circumstances, we conclude that the District Court's "private bank" instruction was not ·erroneous.

■ The Hawleys also argue that the second clause of subsection (3) ("for example, ... a person engaged primarily in the cashing of checks") is inapplicable to them. They insist that their customers' checks were actually "cashed" by commercial banks, not by the Exchange, and that even if they did "cash" checks, they were not "engaged primarily" in that activity. However, although the Hawleys objected to other parts of Instruction 11 at trial, they did not object to the inclusion of the language of subsection (3) that they now seek to contest. While discussing the instruction in chambers, defense counsel read aloud all of section 103.11(e)(3) verbatim, and then stated: "I think it is proper to submit that to the jury...." Tr. at 534. Therefore, under Fed.R.Crim.P. 30, the Hawleys have waived their right to appeal this issue, and we will reverse only for plain error resulting in a miscarriage of justice. *See, e.g., United States v. Gantos*, 817 F.2d 41, 43 (8th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 175, 98 L.Ed.2d 128 (1987). Here, the evidence is overwhelming that the Hawleys were a "financial institution," either because they were a "bank" under section 103.11(e)(1), or persons engaging "as a business in dealing in or exchanging currency" under section 103.11(e)(3). The trial court's inclusion of the subsidiary examples from subsection (3) involving foreign exchange and check-cashing seems to us entirely proper, and certainly does not constitute plain error.

■ Next, the Hawleys invoke the due process clause to argue that even if they fit within a definition of "financial institution," their prosecution is invalid under the "rule of lenity," because the Act does not "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited...." Appellants' Brief at 20 (quoting *United States v. Anzalone*, 766 F.2d 676, 678 (1st Cir.1985) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983)). Extensive quotations from *Anzalone*, describing ambiguities in the reporting requirements, fill more than six, single-spaced pages of appellants' brief. But that case clearly is not on point. The defendant in *Anzalone* was an individual who withdrew funds totaling over $100,000 from banks in "structured transactions," *i.e.,* separate withdrawals of less than $10,000 each. Although Anzalone acquired cash for himself that totaled more than $10,000, he never was involved in a

separate transaction exceeding that amount, unlike the Hawleys, who did make lump-sum deliveries of cash in amounts over $10,000. Anzalone was convicted in the district court for causing a "financial institution" not to file a CTR under 18 U.S.C. §§ 2 and 1001, *see* 766 F.2d at 679, not for failing to file a CTR as a "financial institution" under 31 U.S.C. §§ 5313 and 5322(a). The court of appeals reversed, holding that the reporting requirements for transactions in excess of $10,000 were ambiguous as applied to persons other than "financial institutions." *See id.* at 681. The court did not address the reporting requirements as applied to persons who act as "financial institutions." The same distinction applies to two other cases on which the Hawleys rely heavily. *See United States v. Robinson,* 832 F.2d 1165, 1166 n. 5 (9th Cir.1987) (defendant charged with causing a "financial institution" not to file CTRs, "not ... with operating a currency exchange business that failed to file CTR's"); *United States v. Gimbel,* 830 F.2d 621, 623 (7th Cir.1987) (defendant's actions "constituted a 'scheme' to impede the Treasury Department from collecting [CTRs]").

Moreover, several recent decisions from other circuits establish that currency dealers or exchangers who act as middlemen between individuals and commercial banks can appropriately be defined as "financial institutions" under section 103.11(e)(3), and convicted under section 103.22(a)(1) for failing to report transactions exceeding $10,000 in cash. In *United States v. Dela Espriella,* 781 F.2d 1432, 1436–37 (9th Cir. 1986), the defendant's couriers converted large amounts of cash into cashier's checks of less than $10,000 each through structured transactions at various banks. Although no separate transaction with a commercial bank exceeded $10,000, the defendant violated the law because he delivered cash in excess of $10,000 to his couriers, much like the Hawleys received cash in excess of $10,000 from their couriers for

delivery to the customers of the Exchange. *See also United States v. Mouzin,* 785 F.2d 682, 688–90 (9th Cir.), *cert. denied,* 479 U.S. 985, 107 S.Ct. 574, 93 L.Ed.2d 577 (1986) (defendant who gave cash to undercover agent to deposit in commercial bank without CTRs being filed acted as a "financial institution"); *Goldberg,* 756 F.2d at 953–57 (defendant who accepted cash from undercover agent for "laundering" through a commercial bank acted as a "financial institution"). Although these cases involved the deposit of cash, rather than its withdrawal, the language of the regulations encompasses both types of exchange. "Congress's assumption was that the reporting requirements would be far-reaching," *Goldberg,* 756 F.2d at 955, extending to "operation[s] not only of ... banking, *but also to other financial institutions* involved in the exchange of currency." *Id.* at 954 (quoting 116 Cong.Rec. 16956–57 (1970) (statement of Rep. Widnall) (emphasis added)). The defendant in *Goldberg* had argued, like the Hawleys, that the definitions of section 103.11(e) were too vague to support a criminal conviction. However, as the *Goldberg* court noted, "The rule of lenity is used only to resolve an ambiguity, 'not to ... beget one'.... Nor is it used to narrow a statute that has an unambiguously broad thrust." *Goldberg,* 756 F.2d at 956 (quoting *Callanan v. United States,* 364 U.S. 587, 596, 81 S.Ct. 321, 326, 5 L.Ed.2d 312 (1961)).

■ Finally, the Hawleys claim that they had no notice of the law. This claim rings hollow in light of the scope of their business. The Exchange was not a ma and pa outfit thrown together for the convenience of the Hawleys' friends and neighbors. It was a sophisticated operation, complete with advertising brochures and a variety of printed transaction forms, handling tens of thousands of dollars a year for customers from eleven states. We reject the Hawleys' arguments (as did the jury) that they were unaware of their duty to file CTRs.[2]

---

**2.** The Hawleys do not directly challenge the sufficiency of the evidence on the issue of intent to violate the law. We note that the trial court gave extensive and detailed instructions on this

issue, *e.g.,* "If, after considering all of the evidence in this case, you are not convinced beyond a reasonable doubt that their failure to file transfer reports was for the purpose of disobey-

## II.

At a suppression hearing, the Hawleys argued that the evidence seized by government agents from the Hawleys' home in April 1985 should be excluded because the search warrant was overbroad, and the search itself exceeded the scope of the warrant. The District Court denied the motion, concluding that the search warrant was not overbroad and that any evidence seized outside the scope of the warrant was properly seized under the plain view doctrine, and the good faith rule of *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Tr. at 239–40. The evidence later was admitted at trial over objections by the Hawleys.

The disputed evidence comprises government Exhibits 12 through 31, out of sixty-one exhibits introduced by the prosecution. Exhibits 12, 13, 14, and 15 are lists of clients and actual customer contracts; Exhibit 29 is a copy of the Exchange brochure, another copy of which was given to the undercover agent by the Hawleys and admitted as Exhibit 33; Exhibits 30 and 31 are receipts kept by the Hawleys; and Exhibits 16 through 28 are copies of records kept by commercial banks detailing the transactions of the Exchange.³ After reviewing this evidence, together with the other evidence in the case, we conclude that the other evidence—the government's case without any of the evidence seized from the Hawleys' home or based on the fruit of that search—so strongly supports the jury verdict that there is no reasonable probability the jury would have reached a

different result if the controverted evidence had been excluded. *See, e.g., United States v. Leichtling*, 684 F.2d 553, 557 (8th Cir.1982), *cert. denied*, 459 U.S. 1201, 103 S.Ct. 1184, 75 L.Ed.2d 431 (1983) (even if police improperly seized the evidence in question, the nature of the evidence was cumulative at best and its admission constituted harmless error beyond a reasonable doubt); *United States v. Jackson*, 576 F.2d 749, 753–54 (8th Cir.), *cert. denied*, 439 U.S. 858, 99 S.Ct. 175, 58 L.Ed.2d 167 (1978) (erroneous admission of improperly seized evidence was harmless error where properly admitted evidence was overwhelming).

The uncontroverted evidence includes, *inter alia*, the Exchange brochure (Ex. 33), the 70–minute video of the Hawleys' first transaction with the undercover agent (Ex. 46), the documentation of each step of the undercover transactions (Exs. 32, and 34–42), signature cards from three different commercial banks (Exs. 53, 56, 59), and the testimony of the Alexandria postmaster, who described how the Hawleys had registered and insured packages to be mailed to cities in eleven states (Tr. at 337). This evidence, along with the rest of the uncontroverted evidence, gave the jury ample proof of the nature and scope of the Hawleys' business and their intentions in failing to file CTRs. To the extent that Exhibits 12 through 31 were relevant to the issue of the Hawleys' identity as a "financial institution," they were merely cumulative of other evidence, and they were not relevant to the issue of intent.⁴ We hold that the admission of Exhibits 12 through 31, if it

ing or disregarding the law, then you should find them not guilty." Instruction 15. The jury found that the Hawleys acted with criminal intent, after hearing them testify that they had no intention of breaking the law.

3. The record is not clear whether the copies of bank records comprising Exhibits 16 through 28 were seized from the Hawleys' home or were subpoenaed from the banks. If seized from the Hawleys' home, it would appear that the documents were properly admitted under the "independent source" or "inevitable discovery" doctrines, because the government could have obtained identical evidence from the banks without any search of the Hawleys' home. *See generally Hamilton v. Nix*, 809 F.2d 463, 464–67 (8th

Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987). In any event, as discussed in the text of this opinion, the admission of this evidence, even if erroneous, was harmless beyond a reasonable doubt.

4. At one point in the trial, the District Court ruled that admission of Exhibits 15–28 "will be refused for the reason that the bulk of these exhibits do not contain any material relevant to the issues in the case. To the extent that they contain relevant material, they are cumulative to other evidence already received." Tr. at 240. Although most of these exhibits were admitted in subsequent rulings, we agree with the court's initial observations.

was error, was harmless beyond a reasonable doubt. In view of this holding, we need not, and do not, reach the issue of whether this evidence should have been excluded on search and seizure grounds.

The convictions are AFFIRMED.