**UNITED STATES of America, Appellee,**

v.

**Bradley Carl BROWN, Appellant.**

**No. 88–5221.**

United States Court of Appeals, Eighth Circuit.

Submitted March 17, 1989.

Decided June 20, 1989.

Jonathan E. Fruchtman, Minneapolis, Minn., for appellant.

Franklin L. Noel, Asst. U.S. Atty., Minneapolis, Minn., for appellee.

Before LAY, Chief Judge, and WOLLMAN and MAGILL, Circuit Judges.

MAGILL, Circuit Judge.

In the district court,[1] Bradley Carl Brown was convicted of bank robbery, 18 U.S.C. § 2113, and use of a firearm to commit a felony, 18 U.S.C. § 924.[2] The sole issue on appeal is whether the district court erred in denying Brown's motion to suppress an inculpatory letter that he wrote while in pretrial detention. Brown's jailer seized the letter, reasoning that since Brown had displayed suicidal tendencies since his arrest, the letter might provide information that could help to thwart a suicide attempt.

Brown argues on appeal that the seizure violated his rights under the first and fourth amendments. We hold that (1) the seizure was prompted by a legitimate governmental interest in inmate safety and (2) even if the seized letter were erroneously admitted at trial, its admission was harmless error. Therefore, we affirm the district court's denial of Brown's motion to suppress.

## I.

The First National Bank of Rochester, Minnesota was robbed of $11,000 in cash on December 15, 1987. At 3:15 p.m., a man in a maroon ski mask and an army jacket entered the bank. He pointed a revolver at two tellers and demanded money. One of the tellers reached for a stack of "bait money," which was marked to facilitate tracing in case of robbery. The robber said "don't give me that bait money," so the teller instead relinquished stacks of bills

---

1. The Honorable James M. Rosenbaum, United States District Judge for District of Minnesota.

2. Brown was sentenced to consecutive fifteen and five-year prison terms. The trial court sentenced the defendant as if his criminal conduct occurred prior to November 1, 1987, and did not adhere to the Sentencing Guidelines because it found that the Guidelines were unconstitutional. The Guidelines have now been upheld by the United States Supreme Court in *Mistretta v. United States,* —— U.S. ——, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). The government has not appealed the sentence and on March 17, 1989, subsequent to submission of the case, the government expressly waived any right that it had to question the district court's sentence and expressly stated that "as a matter of executive policy the United States has decided not to initiate legal proceedings seeking a resentencing in any case in which the United States did not appeal a non-guidelines sentence." Letter from Franklin L. Noel, Assistant United States Attorney, March 17, 1989.

from the regular cash supply. The robber put the money in a green duffel bag and fled on foot. Because of the ski mask, none of the eyewitnesses could identify the robber. The surveillance camera in the bank malfunctioned, so it also provided no clues as to the robber's identity.

Earlier that day, Bradley Carl Brown sold a set of tools to an acquaintance for $25 and purchased ammunition for a .45 caliber Colt automatic revolver at the Wild Goose Sports Shop in Rochester. Employees of the Wild Goose Sports Shop later noticed that someone had pried open a gun display case and stolen a Colt .45 automatic revolver.

One day after the Rochester bank robbery, an agent from the Rochester Police Department saw Brown with a great deal of cash, so he asked Brown a few questions. Brown denied having robbed the Rochester bank. However, his responses to the agent's queries contained a variety of inconsistencies. Brown also gave a false address. The agent seized a sales receipt from Brown for one box of .45 caliber ammunition purchased the day before. Brown said the receipt belonged to someone else.

After his encounter with the agent, Brown visited his friend Margaret Idler. He showed her his handgun and a brown briefcase full of cash. Brown explained that he had "robbed a place." When Idler asked if he had received "bait money," Brown replied that his cash had come from a different drawer. Soon two other women, Kim Loranger and Carol Ince, arrived at Ms. Idler's house. Brown told them he robbed the Rochester bank, explaining that he wore a ski mask and an army jacket and that he threatened two tellers.

Brown then began to spend cash freely. He repaid a loan, purchased a used car, shopped at K–Mart and Target, and took several companions out to eat. After spending the evening drinking with Brown, three of his friends decided to rob him. Brown left his briefcase unguarded and Ms. Loranger stole it. Ms. Idler, Ms. Lor-

anger, and a man named Craig Dorweiler drove away with the cash. Brown pursued them in his newly purchased used car.

The chase ended at a filling station. Brown fired shots at the fleeing trio and the police were called. Ms. Idler jettisoned the briefcase in a nearby dumpster. Police pursued Brown at high speeds until he stopped in a junkyard and began to run. The police, equipped with state patrol helicopters and a canine unit, finally arrested Brown. A policeman found Brown's briefcase in the dumpster. It contained no cash, but Brown's partially empty box of .45 caliber ammunition [3] and a receipt marked with his name were still inside. Police later searched Ms. Idler's car and seized twelve envelopes stuffed with cash and a notebook listing people to whom Brown owed money and the amounts owed to them. In Brown's car, police found a K–Mart bag, a maroon ski mask, and a green duffel bag.

Brown confessed the day after his arrest to having stolen the Colt .45 revolver. He also stated that the money found in Ms. Idler's car was bank robbery money, but that he did not commit the robbery. He also made repeated allusions to suicide, telling an agent that he was saving his last .45 caliber bullet for himself and that he had begun to practice pointing a gun at his head.

While in detention at the Scott County Jail after his arrest, Brown wrote a letter to his mother, a Texas resident. The Scott County jailer, Jerome Astrup, concerned about Brown's avowed interest in suicide, seized Brown's letter and read it. Astrup had been informed that in addition to making the aforementioned suicide-related comments to police interrogators, Brown had been examined by a county psychiatrist, who concluded that Brown was potentially suicidal.

As a jailer, Astrup had frequently experienced episodes in which inmates planning to commit suicide had mailed letters to friends or relatives expressing their moti-

---

**3.** The box was marked with a price tag reading $12.99, the same price as that indicated on the receipt the agent had seized from Brown earlier, *see supra.*

vations and regrets. In fact, on numerous occasions, friends and relatives of inmates having received such letters, contacted Astrup to warn him about the inmates' suicidal frame of mind. One successful suicide had occurred during Astrup's career as a jailer.

Brown's letter to his mother was highly inculpatory. It read:

Dear Mother, hi. I had a little excitement this past week, started out I robbed a Rochester bank * * *. So here I sit in the Shakopee jail. They didn't find the gun so that helps. I was at Northern Bellplain Truck Stop when Craig, Kim and Margaret took my briefcase with $5,000. I chased them down to the Texico, I thought they had hid my money in there. The cops came so I took off to the junkyard. I lost the cops in there on foot. I evaded helicopters, dogs and dozens of cops. Then I got a ride to Northern Bell Plain and it was cool. Joe and Steve walked in and Joe called the cops. Steve walked out with me and saw the cops kick me in the back while I was on my knees with my hands in the air. All they have on the bank robbery is people saying I told them I did it in my statement or two on how much money was taken or, dollar sign, presuming money was taken, no idea at all. The cops got $600 so Craig still has a few thousand of my money. I'd like to know what kind of cousin Joe is, I can understand him not wanting to give me a ride or to be seen with me but to call the cops, I don't know what to think of him. We'll see what happens. Write soon. Have a Merry Christmas. Love Bradley.

Tr. 349.

While in detention, Brown discussed the Rochester bank robbery with a fellow inmate named Richard Holmes. He explained to Holmes that he entered the bank, pointed a gun at a teller, received approximately $11,000 in cash, and then ran to his apartment, which was seven or eight blocks from the bank.

## II.

On appeal, Brown contends that Astrup violated his rights under the fourth amendment by seizing the letter to his mother. Brown argues that evidence obtained through the seizure of outgoing inmate mail must be suppressed if (1) the seizure is supported by no *legitimate governmental interest;* and (2) the seizure is not performed pursuant to an *established written policy* of the jail. The government, relying on precedent beginning with *Stroud v. United States,* 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919), counters by arguing that because of Brown's repeated exhibitions of suicidal tendencies, legitimate governmental interests in inmate safety necessitated the seizure.

In *Stroud,* an inmate argued that inculpatory letters he had written while incarcerated were improperly introduced against him as evidence. The Court disagreed, holding that because the letters were "voluntarily written * * * [and] came into the possession of the officials of the penitentiary [without] coercion and under established practice," *id.* at 21, 40 S.Ct. at 53, the seizure was not constitutionally prohibited. Since 1919, a number of cases appear to have limited *Stroud* to situations in which prison officials seize outgoing inmate letters in the exercise of "legitimate governmental interests." *See Meadows v. Hopkins,* 713 F.2d 206, 208–11 (6th Cir.1983); *Golden v. Coombe,* 508 F.Supp. 156, 159–60 (S.D.N.Y.1981). Therefore, even though *Stroud* does not retain all of its original vitality, *see United States v. Kelton,* 791 F.2d 101, 102 (8th Cir.1986), and can no longer be said to give *carte blanche* approval to seizures of outgoing inmate mail, it still controls cases in which such seizures are prompted by a reasonable justification. In *Kelton,* the Eighth Circuit held that because of their reasonable concern for prison security and inmates' diminished expectations of privacy, prison officials do not violate the constitution when they read inmates' outgoing letters. *See Kelton,* 791 F.2d at 103.

This case is not distinguishable from *Stroud* and *Kelton.* In his capacity as a jailer, Astrup had a legitimate governmental interest in prisoner safety. While incar-

cerated, Brown repeatedly displayed suicidal tendencies, giving rise to Astrup's reasonable concern for Brown's safety. As for Brown's contention that the seizure of outgoing inmate mail must only take place pursuant to an established *written* policy of the institution, we see no precedential support for it. *Kelton* suggests that it suffices for a jailer to follow the "established practice," 791 F.2d at 103, of the jail or prison. Brown does not contend that Astrup strayed from the established practices of the Scott County Jail so, under *Kelton,* he did not violate Brown's rights under the fourth amendment.

### III.

■ Brown also contends that the seizure violated his first amendment rights. He cites *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), for the doctrine that "a prison inmate retains those first amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections systems." *Id.* at 822, 94 S.Ct. at 2804.

We hold that Astrup's decision to read Brown's letter is consistent with *Pell.* As we state above, Astrup, as a jailer, had a reasonable and legitimate governmental interest in promoting the safety of inmates in the Scott County Jail. Since Astrup had received reliable information indicating that Brown was contemplating suicide, we do not believe that, under *Pell,* the seizure of Brown's letter was "inconsistent with his status as a prisoner." Further, we hold that Astrup's decision to monitor Brown's psychological state in order to predict and thwart a suicide attempt is just the sort of "legitimate penological objective" required by *Pell.*

### IV.

■ Even if we assume that the district court erred in finding that Astrup's seizure of Brown's outgoing mail was not a constitutional violation, the erroneous admission of Brown's inculpatory letter was harmless beyond a reasonable doubt. *See United States v. Leichtling,* 684 F.2d 553, 557 (8th

Cir.1982), *cert. denied,* 459 U.S. 1201, 103 S.Ct. 1184, 75 L.Ed.2d 431 (1983); *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). The testimonial evidence against Brown from other sources was overwhelming. If the letter had been suppressed, the government could have relied instead on Brown's complete confessions to acquaintances (Ms. Idler, Kim Loranger, Carol Ince and Richard Holmes) and partial confessions to several law enforcement officials. Three witnesses testified during Brown's trial that Brown confessed to the Rochester bank robbery. In light of Brown's other confessions, we cannot conclude that there is a reasonable probability that the outcome of Brown's trial would have been altered if the seized letter had not been admitted. *See United States v. Hawley,* 855 F.2d 595 (8th Cir.1988).