**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED
Oct 17 2013, 5:32 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MICHAEL R. FISHER**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JAMES B. MARTIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DAVID DAVENPORT, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1210-CR-842 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Steven R. Eichholtz, Judge
Cause No. 49G20-1105-FB-34149

**October 17, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**PYLE, Judge**

David Davenport ("Davenport") appeals his convictions and sentences for Class B felony dealing in cocaine[1] and Class A misdemeanor resisting law enforcement.[2]

We affirm and remand.

## ISSUES

1. Whether the trial court abused its discretion by admitting into evidence two letters written by Davenport while in jail.

2. Whether Davenport's sentence is inappropriate pursuant to Indiana Appellate Rule 7(B).

## FACTS

During the afternoon of May 14, 2011, Indianapolis Metropolitan Police Department ("IMPD") Officers Daniel Brezik ("Officer Brezik") and John Walters ("Officer Walters") were separately patrolling the area near Spades Park in Marion County in response to citizens' complaints about narcotics trafficking in the area. As Officer Brezik was driving on Temple Avenue near the intersection of 17th Street, he saw Davenport sitting on a bicycle and talking with an unknown female in the middle of 17th Street. The officer saw that Davenport was gripping a white pill bottle with his left hand and making contact with the female's hand with his right hand. The female saw Officer Brezik, who was about twenty feet away, and pointed at the officer. Davenport turned around, saw Officer Brezik, and rode his bicycle in the opposite direction. Officer Brezik activated his emergency lights and siren and followed Davenport.

---

[1] Ind. Code § 35-48-4-1.

[2] At the time of Davenport's offense, the crime of resisting law enforcement was codified under Ind. Code § 35-44-3-3. Effective July 1, 2012, it is codified under Ind. Code §35-44.1-3-1.

Davenport did not stop his bicycle but continued to ride away from Officer Brezik. Davenport repeatedly looked back over his shoulder as the officer followed five feet behind him. Davenport then jumped off his bicycle and attempted to run away but fell toward the side of Officer Brezik's police car. The officer swerved his wheel and struck Davenport's bicycle. Davenport got off the ground and ran past Officer Brezik's police car. The officer yelled for Davenport to stop, but Davenport did not comply and continued to run. Officer Brezik then saw Davenport throw the white pill bottle toward the curb and under a parked car.

Davenport ran back toward the intersection at Temple and 17th Street, and Officer Walters pulled up and blocked Davenport's path. The officers ordered Davenport to the ground and eventually were able to place him in handcuffs. As Officer Brezik walked Davenport back to his patrol car, they walked past the parked car where Davenport had thrown the white pill bottle. Officer Brezik then saw a plastic baggie containing a small rock of cocaine. Officer Walters had the owner of the parked car move the car, and he discovered thirteen more baggies of cocaine and the white pill bottle.[3] When the officers searched Davenport, they found that he had ninety-nine dollars in mostly five-dollar and one-dollar bills.

The State charged Davenport with Count I, Class B felony dealing in cocaine (possession with intent to deliver); Count II, Class B felony possession of cocaine within 1,000 feet of a park; Count III, Class A misdemeanor resisting law enforcement (based on

---

[3] Upon retrieving the white pill bottle, the officers discovered that the white bottle originally contained diabetes testing strips.

3

fleeing); and Count IV, Class A misdemeanor resisting law enforcement (based on resisting).

While Davenport was incarcerated in the Marion County Jail, he wrote two letters ("jail letters") that were intercepted by the jail's civilian mail clerk Brian Rodgers ("Rodgers"). The first letter ("Letter 1") was returned to the jail from the post office for insufficient postage. The envelope was addressed to "Cuz and Cuz" and contained Davenport's name in the return address. Rodgers, who believed that the letter was an attempt to circumvent the prohibition against inmate-to-inmate mail, opened and read the letter. In Letter 1, Davenport wrote the following:

> . . . on 5-14-11 I was right in the middle of the street inbetween 17[th] Tacoma and tempal geting ready to make a sale to this sting name Helen boo know who she is, now she saw the police behind me and said their go the police so i cuff the white ~~pill~~ bottle that i had my sacks in, and took off on the bike i never did make the sale, so now the police was behind me chaseing me . . . .

(State's Ex. 2) (errors and strikeout in original). Davenport also wrote about other details surrounding his crime and arrest, including the information about how he threw the white bottle under a car and how his bicycle was hit by the police car. The envelope of Letter 1 also contained a photograph of a bicycle with a bent rim and a copy of Davenport's charging information. Rodgers forwarded Letter 1 to the jail's Special Investigation Unit, and he was instructed to continue to monitor Davenport's mail.

A few days later, Davenport handed Rodgers another letter ("Letter 2"). The envelope of Letter 2 was addressed to Joyce Davenport, contained Davenport's name in

the return address, and contained a copy of Davenport's charging information. In Letter 2, Davenport wrote, in part:

> Honey
> check this out just read my case and when you get to the part about the unkown womman that's who i need you to be. to come to court and be my wittness, and all you need to say is <u>i lit your cigerette and the police hit me off the bike and you was comeing to see if i was ok but he stop you from comeing down their and he made you leave</u> . . . when the lawyer come to your house you are going to tell him just the way i got it in this letter so read it over and over ok. . . .

(State's Ex. 3) (errors and emphasis in original). Rodgers read Letter 2 and then forwarded it to the jail's Special Investigation Unit. The Special Investigation Unit ultimately forwarded the jail letters to the prosecutor's office. The State provided discovery notice to Davenport that it intended to introduce the jail letters into evidence at trial.[4]

A jury trial was held on September 12, 2012. Prior to opening statements, the State asked the trial court to make a preliminary ruling on the admissibility of Davenport's jail letters. During the preliminary hearing, the State presented testimony from Rodgers and introduced the Marion County Jail Inmate Handbook ("the inmate handbook"), which each inmate receives when booked into the Marion County Jail. The inmate handbook contains a section regarding "Mail Regulations" for inmates and provides, in relevant part:

> All mail for inmates, both incoming and outgoing, will be opened to intercept cash, checks, and money orders. It shall be read, censored or rejected based on content and for security reasons. It will be inspected for

---

[4] The record reveals that Davenport filed a grievance against the jail, challenging the seizure of his jail letters.

contraband. The exception will be legal mail which is opened in the presence of the inmate.

(State's Ex. 1 at 2). In a section dealing with the requirements for inmates to have mail delivered to them (i.e., inmates must produce a "valid and legible jail identification armband" and must be "clothed"), the inmate handbook provides that "[i]f it becomes necessary to withhold an inmate's mail, he or she will be promptly notified." (State's Ex. 1 at 2). The inmate handbook also provided that correspondence between inmates was prohibited.

During the hearing, Davenport argued generally that "there is a federal violation and a state constitution violation." (Tr. 48-49). Davenport did not challenge the opening or reading of his jail letters; instead, his argument focused mainly on the State's detention of the jail letters. He asserted that the inmate handbook created some sort of expectation of privacy in his mail and an expectation that his mail would not be held unless it constituted a security threat. He suggested that if the content of his letters did not relate to security purposes, then they could not be retained. Davenport argued that the jail letters were inadmissible because the detention of the letters was in violation of the inmate handbook and because the State did not obtain a search warrant to detain the jail letters.

The State argued that the inmate handbook allowed for the opening and reading of the jail letters based on the content and that the letters were seized because they related to the crime for which he was charged. The State argued that Davenport's remedy for his contention that the seizure of the jail letters was contrary to the inmate handbook was a

6

"civil remedy," not exclusion of the jail letters from evidence. (Tr. 51). The trial court reserved its ruling until the jail letters were offered for admission during the trial.

During trial, when the State offered the jail letters into evidence as State's Exhibit 2 and Exhibit 3, Davenport objected and asked the trial court to incorporate his prior arguments from the preliminary hearing. The trial court ruled that the jail letters were admissible. Specifically, the trial court stated:

> [T]he Court notes that numerous cases have concluded that . . . inmates in jail or correctional facilities have no reasonable expectation of privacy in their letters when they have been placed on notice [that] they are subject to being opened, searched for contraband. The testimony was . . . tendered to court showing that [there is] a jail policy . . . decimated to all inmates upon their admission. There being no Fourth Amendment issues of constitutionality, the Court finds that while procedures may give rise to some other legal rights in a different tribunal, they do not affect the admissibility of evidence; therefore the letters will be admissible.

(Tr. 90).[5]

At the end of the State's evidence, the trial court granted Davenport's motion for a directed verdict on the resisting law enforcement charge in Count IV. The jury found Davenport guilty of dealing in cocaine, possession of cocaine, and resisting law enforcement. The trial court entered judgment of conviction on the dealing in cocaine and resisting law enforcement verdicts only and merged the possession conviction it into the dealing conviction.

During Davenport's sentencing hearing, the trial court acknowledged Davenport's physical and mental health problems but did not find any mitigating circumstances. The

---

[5] Davenport also objected to Letter 2 (State's Exhibit 3) based on relevancy and prejudice. The trial court also overruled this objection. In this appeal, Davenport does not challenge the admissibility of the jail letters based on this objection.

trial court found the following aggravating circumstances: (1) Davenport was on parole at the time of his offenses; (2) his criminal history; and (3) his previous parole and probation violations. The trial court imposed a fifteen (15) year sentence for Davenport's Class B felony dealing in cocaine conviction and a 1,002 day sentence on his Class A misdemeanor resisting law enforcement conviction and ordered that they be served concurrently in the Department of Correction.[6] Davenport now appeals.

## DECISION

### 1. Admission of Evidence

Davenport argues that the trial court abused its discretion by admitting into evidence his two jail letters, State's Exhibits 2 and 3. Specifically, Davenport contends the seizure of the jail letters violated his rights under the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Indiana Constitution.

The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for an abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Conley v. State*, 972 N.E.2d 864, 871 (Ind. 2012), *reh'g denied*.

   A. *Fourth Amendment*

---

[6] As discussed in further detail below, we remand this case to the trial court to impose a sentence on Davenport's Class A misdemeanor conviction that complies with the sentencing statutes.

8

Davenport contends that the warrantless seizure of his jail letters violated his rights under the Fourth Amendment.[7]

The Fourth Amendment protects citizens against unreasonable searches and seizures. *See* U.S. Const. amend IV. "The reasonableness of a search requires that the subject of the search has exhibited an actual subjective expectation of privacy that society as a whole is prepared to recognize as objectively 'reasonable.'" *Trimble v. State*, 842 N.E.2d 798, 801 (Ind. 2006) (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)), *adhered to on reh'g*, 848 N.E.2d 278 (Ind. 2006). Thus, the question on appeal is whether Davenport had a reasonable expectation of privacy in his outgoing mail.

Generally, Indiana courts have held that "inmates have a reduced expectation of privacy." *Lemond v. State*, 878 N.E.2d 384, 392 (Ind. Ct. App. 2007) (citing *Bell v. Wolfish*, 441 U.S. 520, 557 (1979)), *trans. denied.* For example, inmates do not have a reasonable expectation of privacy in their cells. *See Perkins v. State*, 483 N.E.2d 1379, 1384 (Ind. 1985) (explaining that a prison inmate does not have a Fourth Amendment reasonable expectation of privacy in his prison cell because such a right of privacy is incompatible with the need to maintain security in the prison); *Cleary v. State*, 663

---

[7] The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

N.E.2d 779, 783 (Ind. Ct. App. 1996) (holding that a jail inmate does not have a right to privacy in his jail cell).

Additionally, the United States Supreme Court, our Indiana Supreme Court, and our Court have addressed Fourth Amendment concerns related to reading inmate mail and have held that inmates typically have no expectations of privacy in their mail. *See Stroud v. United States*, 251 U.S. 15, 21-22 (1919) (holding that the prison's seizure of a prison inmate's incriminating letters did not violate the inmate's Fourth Amendment rights where the letters were voluntarily written, obtained without threat or coercion, and came into possession of prison officials through "established practice, reasonably designed to promote the disciple of the institution"), *reh'g denied*; *Grooms v. State*, 269 Ind. 212, 220, 379 N.E.2d 458, 463 (Ind. 1978) (affirming the seizure and admission of an inmate's outgoing letter into evidence where the inmate knew that jail officials read inmates' mail, resulting in no reasonable expectation of privacy in the mail), *cert. denied*; *Rennert v. State*, 263 Ind. 274, 277, 329 N.E.2d 595, 598 (Ind. 1975) (finding that the defendant had waived his Fourth Amendment claim but explaining that there is a legitimate state interest in searching and reading a prisoner's outgoing mail and that a prisoner has no expectation of privacy where he has notice that officials read his mail); *Hawkins v. State*, 884 N.E.2d 939, 946 (Ind. Ct. App. 2008) (holding that an inmate "had no privacy interest in her outgoing letters" where she "had notice of the possibility that her letters would be read"), *trans. denied*.

Davenport asserts that the inmate handbook created a reasonable expectation of privacy and a belief that his mail would be opened in strict accordance with the

10

provisions set forth in the handbook. He acknowledges that the inmate handbook provided notice that his outgoing mail could be opened and seized, but he contends that the inmate handbook restricted such seizures "only for 'security reasons[.]'" (Davenport's Br. 9). Davenport also argues that the holding in *Stroud* should be limited to situations where there is a legitimate government interest. He contends that because his jail letters posed no security threat, then "the jail had no legitimate interest in seizing" the jail letters. (Davenport's Br. 8). We disagree.

Here, the record reveals that Davenport had notice, via the inmate handbook, that all incoming and outgoing inmate mail was subject to inspection. The inmate handbook provided that inmate mail would be "read, censored or rejected based on *content and for security reasons*." (State's Ex. 1 at 2) (emphases added). Thus, the inmate handbook notified Davenport that his jail letters would be read for content *and* security reasons. The record further reveals that Rodgers, in the course of his duties as mail clerk of the jail and pursuant to the guidelines of the inmate handbook, read Davenport's jail letters and forwarded them to the jail's Special Investigation Unit. Because Davenport had notice that his mail was subject to being read, he had no reasonable expectation of privacy in the jail letters. *See, e.g.*, *Stroud v*, 251 U.S. at 21-22; *Grooms*, 379 N.E.2d at 463; *Rennert*, 329 N.E.2d at 598; *Hawkins*, 884 N.E.2d at 946.

In regard to Davenport's argument regarding *Stroud*, federal cases have discussed the limitations to and continued applicability of *Stroud*:

> Since 1919, a number of cases appear to have limited *Stroud* to situations in which prison officials seize outgoing inmate letters in the exercise of "legitimate governmental interests." *See Meadows v. Hopkins*, 713 F.2d

11

206, 208–11 (6th Cir. 1983); *Golden v. Coombe*, 508 F.Supp. 156, 159–60 (S.D.N.Y. 1981). Therefore, even though *Stroud* does not retain all of its original vitality, *see United States v. Kelton*, 791 F.2d 101, 102 (8th Cir. 1986), and can no longer be said to give *carte blanche* approval to seizures of outgoing inmate mail, *it still controls cases in which such seizures are prompted by a reasonable justification*. In *Kelton*, the Eighth Circuit held that because of their reasonable concern for prison security and inmates' diminished expectations of privacy, prison officials do not violate the constitution when they read inmates' outgoing letters. *See Kelton,* 791 F.2d at 103.

*United States v. Brown*, 878 F.2d 222, 225 (8th Cir. 1989) (emphasis added). Even if we were to so limit *Stroud*, our Indiana Supreme Court has stated that "there is a legitimate state interest in searching a prisoner's mail for contraband" and that reading an inmate's mail may be justified by security reasons, such as the need "to determine whether an escape attempt is impending." *Rennert*, 329 N.E.2 at 598. Additionally, we have explained that "[j]ails and prisons have an interest in maintaining prison security and preventing illegal acts by inmates . . . ." *Hawkins*, 884 N.E.2d at 946 (citing *United States v. Whalen*, 940 F.2d 1027, 1035 (7th Cir. 1991), *cert. denied*). Due to Davenport's lack of reasonable expectation of privacy and the jail's interest in searching and reading inmates' mail for security purposes, the trial court did not err in admitting the jail letters into evidence. *See Hawkins*, 884 N.E.2d at 946 ("'[B]ecause of their reasonable concern for prison security and inmates' diminished expectations, prison officials do not violate the constitution when they read inmates' outgoing letters.'") (quoting *Brown*, 878 F.2d at 225)).

B. *Article 1, Section 11*

12

Davenport also argues that the trial court should have excluded the jail letters from evidence based on Article 1, Section 11 of the Indiana Constitution.[8] Specifically, Davenport contends that that the seizure of his jail letters was unreasonable under the totality of the circumstances.

"The purpose of Article 1, Section 11 is to protect from unreasonable police activity those areas of life that Hoosiers regard as private." *Taylor v. State*, 842 N.E.2d 327, 334 (Ind. 2006). "The legality of a governmental search under the Indiana Constitution turns on an evaluation of the reasonableness of the police conduct under the totality of the circumstances." *Litchfield v. State*, 824 N.E.2d 356, 359 (Ind. 2005). "The totality of the circumstances requires consideration of both the degree of intrusion into the subject's ordinary activities and the basis upon which the officer selected the subject of the search or seizure." *Id.* at 360. While other relevant considerations may exist under the circumstances of the case, the reasonableness of the search or seizure turns on a balance of: (1) the degree of concern, suspicion, or knowledge that a violation has occurred; (2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities; and (3) the extent of law enforcement needs. *Id.* at 361.

Here, Davenport was an inmate in jail and had notice that all of his incoming and outgoing mail would be inspected and read based on content and for security reasons.

---

[8] Article 1, Section 11 of the Indiana Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

Davenport sent two letters—one letter containing incriminating statements about his involvement in the crimes at issue and the other letter requesting a person to lie at his trial—that were then read by jail officials based on content and for security reasons as explained in the inmate handbook. Thus, the degree of intrusion on Davenport was minimal because he was notified that his mail would be subject to inspection. Additionally, Letter 1 was returned to the jail with insufficient postage and appeared to be an attempt to evade the prohibition against inmate-to-inmate correspondence, thereby raising a degree of concern regarding a violation. Finally, the extent of law enforcement need was high where the act of monitoring an inmate's mail assists with jail security. Based on the totality of the circumstances and the specific facts of this case, we conclude that the seizure of the jail letters was reasonable and not in violation of Article 1, Section 11. Therefore, the trial court did not err in admitting the jail letters into evidence.[9]

2. Inappropriate Sentence

Davenport contends that his fifteen-year sentence for his Class B felony dealing in cocaine conviction was inappropriate. Davenport acknowledges that he has a prior criminal history and that he was on parole at the time of his crimes, but he asks this Court to revise his sentence to something "less than fifteen years." (Davenport's Br. 17)

---

[9] Even if the trial court erred in admitting the jail letters into evidence, it would have constituted harmless error. "Errors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party." *Fleener v. State*, 656 N.E.2d 1140, 1141 (Ind. 1995). *See also* Ind. Trial Rule 61. Here, the police officers' testimony provided independent evidence establishing Davenport's crimes of dealing in cocaine and resisting law enforcement. Thus, any error in the admission of the jail letters would be harmless. *See, e.g.*, *Perry v. State*, 505 N.E.2d 846, 850 (Ind. Ct. App. 1987) (holding that, even if an inmate's jail letter was illegally seized and improperly admitted at trial, the admission of such jail letter would constitute harmless error).

14

We may revise a sentence if it is inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B). The defendant has the burden of persuading us that his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). The principal role of a Rule 7(B) review "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). Whether a sentence is inappropriate ultimately turns on "the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other factors that come to light in a given case." *Id.* at 1224.

When determining whether a sentence is inappropriate, we acknowledge that the advisory sentence "is the starting point the Legislature has selected as an appropriate sentence for the crime committed." *Childress*, 848 N.E.2d at 1081. The sentencing range for a Class B felony is between six (6) and twenty (20) years, with the advisory sentence being ten (10) years. I.C. § 35-50-2-5. Here, the trial court, after finding multiple aggravating circumstances, enhanced the advisory term by five years and imposed a fifteen (15) year sentence for Davenport's Class B felony dealing in cocaine conviction.

The nature of Davenport's offenses reveal that Davenport, who was on parole, had fourteen baggies of cocaine and was prepared to sell it near the area of a park where children gathered. When police caught him in the act, Davenport fled from police. Davenport attempts to minimize the nature of his dealing in cocaine conviction by

15

arguing that he was a "relatively minor drug dealer" with a "relatively small amount of cocaine" and that he merely "stumbled upon someone else's stash of cocaine and decided to sell it rather than consume it." (Davenport's Br. 16, 17). Davenport has not convinced us that his sentence that exceeded the advisory term by five years is inappropriate given the nature of his offenses.

As to Davenport's character, the record reveals that Davenport—who was forty-seven years old at the time of his offenses—has amassed a criminal history that includes a Class B felony conviction for attempted robbery, three Class C felony convictions for forgery, a Class D felony conviction for theft, as well as misdemeanor convictions for disorderly conduct, possession of paraphernalia, and driving while suspended. Even more troubling, at the time Davenport committed the crimes in this case, he was on parole from a Class B felony attempted robbery conviction and had previously violated that parole by testing positive for drugs. He also previously violated parole and probation in another case involving his forgery and theft convictions. The presentence investigation report ("PSI") indicates that Davenport had disciplinary problems during his previous incarceration in the Department of Correction, receiving twelve major and thirty minor disciplinary conduct reports.

Additionally, Davenport's history of alcohol and drug use does not reflect positively on his character. The PSI reveals that Davenport admitted to trying alcohol and marijuana at the age of twelve and to regularly using both since the age of sixteen. Davenport, who was on parole, admitted that he was using alcohol and marijuana daily at the time of his offenses. Davenport also admitted that he started using crack cocaine at

16

the age of twenty-one and to daily use of the drug until 2009. Finally, the jail letters admitted at trial reveal that Davenport was willing to engage others to help him fabricate evidence at his trial. To be sure, Davenport's history of criminal activity, commission of this crime while on parole, prior disciplinary problems while incarcerated, and admitted illegal drug use reflect poorly on his character and indicate nothing but a disregard for the law.

Davenport suggests that his mental illness—specifically, his self-reported diagnoses of bipolar disorder and post-traumatic stress disorder—should be considered when reviewing his character. The trial court, however, acknowledged Davenport's mental health issues but determined that Davenport had not shown them to be mitigating. Nor does Davenport show them to be on appeal.

Davenport has not persuaded us that his sentence for his Class B felony dealing in cocaine conviction is inappropriate. Therefore, we affirm the trial court's sentence.

While we affirm Davenport's sentence for his Class B felony dealing in cocaine conviction, we remand to the trial court to resentence Davenport on his Class A misdemeanor resisting law enforcement conviction. Here, the trial court imposed a 1,002 day sentence for Davenport's Class A misdemeanor conviction. Pursuant to Indiana Code § 35-50-3-2, "[a] person who commits a Class A misdemeanor shall be imprisoned for a fixed term of not more than one (1) year . . . ." Thus, we remand this case to the trial court to impose a sentence on Davenport's Class A misdemeanor conviction that comports with Indiana Code § 35-50-3-2.

Affirmed and remanded.

KIRSCH, J., and VAIDIK, J., concur.